MONA ROBERTSON v. C. B. ROBERTSON.

No. A-6763. Decided April 29, 1959.
Rehearing overruled May 27, 1959.
(323 S.W. 2d Series 938)

568

*Hamilton & Deaver* and *Sam J. Hamilton,* all of Memphis, Texas, for petitioner.

*Sanders, Scott, Saunders & Smith* and *Albert Smith,* all of Amarillo, for respondent.

MR. JUSTICE SMITH delivered the opinion of the Court.

This suit was instituted by respondent, C. B. Robertson,

against Petitioner, Mona Robertson, as an action for a mandatory injunction to compel the removal of an embankment constructed by petitioner and for damages. This is the second appeal of this case. See 291 S.W. 2d 452. Plaintiff is the owner of 100 acres of land located in Hall County, Texas, and described as being the east 80 acres of the southwest quarter (SW/4), and the west 20 acres of the southeast quarter (SE/4) in Section 110, Block 2, T. & P. Ry. Co. Survey. The defendant is the owner of 240 acres of land lying immediately north and northeast of plaintiff's land. Plaintiff contends that the embankment was erected in such a position and height as to divert the natural flow of the surface water from defendant's land across and over plaintiff's land. The land involved is part of a section of land once owned by the mother and father of the plaintiff. The plat below shows the approximate location of the land involved in this suit. The tract identified as "Charles B. Robertson's 100 acres" is owned by the plaintiff, and the one identified as "Mona" is owned by defendant.

According to plaintiff, the natural flow of the surface waters from the defendant's land and from the land to the north and the east of the defendant is and has always been across the defendant's land and off that land at the southwest corner of the land owned by the defendant. Plaintiff alleged that the defendant diverted the natural flow of the surface water and turned it upon the land of plaintiff; that the defendant first diverted the flow in October 1953, by placing wire plaster board and other material in the mouth of the natural flow of the surface waters on her land, causing the natural flow of the surface water to go across the land of plaintiff destroying terraces and cotton to his damage in the net sum of $1,000.00. The next

act alleged is that in December 1953, the defendant caused to be constructed a dike in the mouth of the natural flow of the surface water on her land causing a loss of seven bales of cotton of the net value of $700.00; that this same dike diverted the natural flow of the surface water from heavy rains in May 1954, causing such water to cross plaintiff's land; that the excess water increased the size and distance of the creek or river and broke all of the terraces situated on his land to his damage in the sum of $2000.00; that he also sustained or would sustain a net loss of $3500.00 covering the value of his 1955 and 1956 cotton crop. Plaintiff prayed for his damages and for the additional sum of $2500.00 as exemplary damages.

The defendant denied that she diverted the natural flow of the surface water in any manner, but alleged to the contrary that the natural channel of the creek crossed the north line of plaintiff's land at the northeast corner of his 100-acre tract and that the surface water flowed in a southwesterly direction across plaintiff's land to a ditch on the west line and thence south and off the section of land of which plaintiff's land is a part; that after the plaintiff received his 100 acres in the partition of 1938, he terraced his land and placed a shelter belt of trees along his north line from the west to the creek bank, raising the elevation of his land, which impeded the natural flow of the waters of the creek; that the water thereafter pushed out the west bank of the creek just north of and adjoining the land of plaintiff, causing the creek to change its course and go west across defendant's land and not southwest across plaintiff's land as had always been its natural course. Defendant's position is that she thereupon placed the embankment (dike) on the spot where the west bank of the creek had been before it was washed away and in doing so did not divert the natural flow of the water, but, on the contrary, it continued to flow in what had always been its natural course and that the embankment did not divert any water from the course.

The case was submitted to a jury on special issues, in response to which the jury found in favor of the defendant on all material issues. The jury found favorable to the defendant that *the natural flow of the surface waters from the land owned by the defendant was near the northeast corner of the land owned by the plaintiff;* that some waters flowed across plaintiff's land before the levee was constructed by the defendant; *that the natural flow of the surface waters from the land owned by the defendant was not at the southwest corner of the defendant's land as claimed by the plaintiff;* that the defendant did not cause to be placed in the natural flow of the surface waters plaster

boards and other obstructions as alleged by the plaintiff; that in October 1953, the defendant did not divert surface waters across the land of the plaintiff in excessive, unnatural, and destructive quantities, as alleged by plaintiff *and that plaintiff sustained no damages to his cotton crops or land by any act charged against the defendant;* that the defendant was not prompted by malice toward the defendant at the time she caused the levee or embankment in question to be constructed.

Judgment was entered that the injunction prayed for by plaintiff be in all things refused, and that all relief including prayer for damages be denied. The judgment was reversed by the Court of Civil Appeals, and judgment there rendered that a mandatory injunction issue, ordering the defendant to "tear down and remove the levee and restore the ground to the condition it was in immediately prior to the construction of the levee involved." The judgment of the trial court denying damages was reversed and remanded to the trial court for a new trial. 309 S.W. 2d 957.

■ The defendant secured favorable jury findings on several additional defenses to plaintiff's suit, but under our view of the case, the only question to be resolved here is whether the jury findings that the natural flow of the surface waters from the land owned by the defendant is near the northeast corner of the land owned by plaintiff, and whether the levee or embankment constructed by the defendant did not divert the natural flow of such surface waters are supported by probative .evidence. We have concluded that the evidence supports the findings of the jury on these controlling issues, therefore, a determination of the other issues that were raised is unnecessary to a decision of this case.

The jury found against the plaintiff on every material issue submitted by the court touching upon the question here under consideration. Plaintiff's position that the natural flow of the surface waters from the defendant's land and from the land to the north and the east of the defendant had always been across the defendant's land and flowed off of said land at the southwest corner thereof until defendant diverted the natural flow with the levee constructed by her in 1953, was denied by the jury's answer to special issue No. 1.[1] The findings of the

---

1.—"SPECIAL ISSUE NO. 1:

"From the greater weight of the credible evidence admitted in your hearing, do you find that the natural flow of surface waters from the land owned by the defendant, Mona Robertson, is at the Southwest Corner of the land owned by the Defendant, Mona Robertson? Answer 'yes' or 'no'.

"ANSWER: *No.*"

jury was supported by the testimony of a number of witnesses. Some of these witnesses testified that the natural flow of the surface waters was the same in 1907 and 1909, as at the time of the trial, and that at all times the natural flow was from the defendant's land across that of plaintiff's. The evidence shows that immediately after receiving the 100 acres awarded to him by partition agreement, the plaintiff built terraces on his land to where the water could not flow in its natural course across his land, and that he also placed a shelter belt of trees along his north line from the west to the creek bank, and that such acts impeded the natural flow of the waters; that thereafter the water pushed out the west bank of the creek just north of and adjoining the land of plaintiff causing the creek to change its course and go west across defendant's land and not in its natural southwest course across plaintiff's land; that the levee or embankment was placed on the spot where the west bank of the creek had been before plaintiff's terraces and tree shelter belt were constructed; that the levee or embankment was not six to eight feet higher than the ground level as testified by plaintiff. Mr. Reed, who was employed by the defendant to replace the west bank of the creek, testified that the west bank of the creek had been washed out and that in constructing the levee or embankment he "put the dirt right back on the bank." Mrs. Robertson, the defendant, testified that she caused the embankment to be built where the old creek bank was before the plaintiff erected his terraces and placed the timber shelter belt along his north line; that the embankment was built to replace the west bank of the creek and that the embankment was placed where the west bank was located before it was "pushed" out by the water that was held back by the plaintiff's terraces and shelter belt.

Mr. Cawfield, the person in charge of soil conservation, testified that he made a survey on the ground for the purpose of establishing a levee or dike along the stream bank that had pushed out; that he did not see the embankment after it was constructed, but that reports were made to him that it had been completed as originally planned; that the plans called for the embankment to end at a point about 150 feet north of plaintiff's land and the embankment to be about four feet high. The defendant's evidence raises an inference that the embankment was built in accordance with the plans of the soil conservation department. Mr. Cawfield also testified that prior to the survey, the plaintiff had terraced below his north line and that the terraces would definitely increase the elevation of plaintiff's land. He testified that the creek entered the north line by plaintiff's

land at approximately the center or a little west of the center; that Charlie (the plaintiff) had terraced below his north line, and that the terraces, together with the sand and debris held by the shelter belt, had increased the elevation of the plaintiff's land, thereby stopping the ffow of the water. He testified that the old creek channel did not have a well defined bank at the plaintiff's north line. The jury could have reasonably concluded from all of this evidence that the defendant did not build the embankment to the plaintiff's north line, but only to replace the well defined west bank of the creek, which was at a point above plaintiff's north line. The jury accepted the testimony of the defendant that she replaced the west bank of the creek, and, in answer to special issue No. 9[2] rejected the plaintiff's contention that the natural flow of the water was diverted across his land by the construction of an embankment six or eight feet high down to his north line. We shall not attempt to set out from the 481-page statement of facts all of the evidence supporting the jury finding (issue No. 25)[3] that the natural flow of the surface waters from the land owned by the defendant is near the northeast corner of the land owned by the plaintiff. The evidence and the finding of the jury was directly contrary to the evidence given by the plaintiff. The plaintiff testified that the natural flow of surface water was never at any time prior to the erection of the embankment at the northeast corner of his land or at any point where it naturally flowed across his land, but that the natural flow of the surface waters was in a southwesterly direction across the defendant's land and the natural flow left her land near her southwest corner, and near his northwest corner.

■ It is well settled that in passing on no evidence points the evidence must be viewed in the light most favorable to the verdict. Following that rule, we have discarded all adverse evidence, and, having given credit to all evidence on this question which was favorable to the verdict of the jury, we have con-

2.—"SPECIAL ISSUE NO. 9:
"From the greater weight of the credible evidence admitted in your hearing, do you find that the levee which the Defendant, Mona Robertson, caused to be constructed upon her land diverted surface waters from its natural course onto and across the land of the Plaintiff, C. B. Robertson, in excessive, unnatural and destructive quantity? Answer 'yes' or 'no.'
"ANSWER: *No.*"

3.—"SPSCIAL ISSUE NO. 25:
"From the greater weight of the credible evidence admitted in your hearing, do you find that the natural flow of the surface waters from the land owned by the Defendant, Mona Robertson, is near the Northeast corner of the land owned by the Plaintiff, C. B. Robertson? Answer 'yes' or 'no.'
"ANSWER: *Yes.*"

cluded that the Court of Civil Appeals was without authority to reverse the judgment of the trial court and render the judgment as it did. The mandatory order issued by that court that the defendant remove the levee or embankment and "restore the ground to the condition it was in immediately prior to the construction of the levee involved," if sustained, would deprive the jury of its sole right to weigh the evidence, and would be the equivalent of permitting the Court of Civil Appeals to substitute its findings and conclusions for that of the jury. The jury, not the court, is the fact-finding body, and there being evidence of probative force sustaining the finding of the jury on the issues under discussion, the judgment entered by the trial court, based upon such findings, must stand as against a no evidence point. Therefore, the Court of Civil Appeals will not be permitted to reverse and render the trial court's judgment. The effect of the rendition is to hold as a matter of law that the plaintiff's prayer for the mandatory order or injunction should have been granted in spite of the jury findings. See Childre v. Casstevens, 148 Texas 297, 224 S.W. 2d 461; Eastham v. Hunter, 98 Texas 560, 86 S.W. 323; Choate v. San Antonio & A. P. Ry. Co., 90 Texas 82, 36 S.W. 247, 37 S.W. 319; Singer v. Singer, 150 Texas 115, 237 S.W. 2d 600, Woodward v. Ortiz, 150 Texas 75, 237 S.W. 2d 286; Cartwright v. Canode, 106 Texas 502, 171 S.W. 696; Benoit v. Wilson, 150 Texas 273, 239 S.W. 2d 792.

Plaintiff relies upon the case of Bunch v. Thomas, 121 Texas 225, 49 S.W. 2d 421, to support his contention that as a matter of law he is entitled to a mandatory order commanding the removal of the embankment. We agree that, if the facts in the present case were conclusive, as in the Bunch case, supra, the natural flow of the surface waters was not across plaintiff's land, then the holding in the Bunch case would apply. The Bunch case recognizes that the question of whether or not the natural flow of water has been diverted from its natural course is a fact question.

No contention is made by the plaintiff that he had acquired by prescription or otherwise a right to have the water flow as it did after the construction of his shelter belt and terraces.

We come now to the judgment to be entered. We have examined the plaintiff's-appellant's brief in the Court of Civil Appeals and find no points of error upon which the judgment of that court could be affirmed. The particular point of error considered by that court, upon which it reversed and rendered the judgment of the trial court, was plaintiff's first point of error.

The point was that "The court erred in refusing to issue a mandatory injunction requiring the defendant to tear down the levee and retore the ground to the condition it was in immediately prior to the construction of the levee involved in this case." It is our view that the Court of Civil Appeals in sustaining this point of error treated the point as raising the question of "no evidence" to sustain the verdict of the jury and judgment of the trial court refusing and denying the plaintiff's prayer for a mandatory injunction commanding or ordering the defendant to remove the embankment and restore the ground to its natural condition prior to the erection of the embankment. The plaintiff by his ninth and last point of error urged in the Court of Civil Appeals that "The finding of the jury that the levee did not divert the surface water onto the plaintiff's land in damaging quantities and that the damage would have occurred anyway is against the great and overwhelming preponderance of the evidence."

■ The judgment of the Court of Civil Appeals granting the mandatory injunction is equivalent to a holding that there was no evidence to support the answers to the issues herein discussed. A finding of no evidence, such as the Court of Civil Appeals made, includes a holding by that court that the answers were against the great weight and preponderance of the evidence. Corzelius v. Oliver et al., 148 Texas 76, 220 S.W. 2d 632; Barker v. Coastal Builders, 153 Texas 540, 271 S.W. 2d 798.

■ Since the Court of Civil Appeals had before it proper assignments or points of error separately, raising both the question of no evidence to support the controlling issues and that the answers to the issues were against the great weight and preponderance of the evidence, it follows that the only judgment to be entered by this Court is to reverse the judgment of the Court of Civil Appeals granting the mandatory injunction and remand the case to the trial court for a new trial, and affirm that part of its judgment remanding the case for trial on the issue of damages.

The judgment of the Court of Civil Appeals is reversed in part and affirmed in part.

Opinion delivered April 29, 1959.

Rehearing overruled May 27, 1959.