James H. BUTLER, Petitioner,

v.

L. H. (Bud) HANSON, Respondent.

No. B–1233.

Supreme Court of Texas.

June 10, 1970.

Stubbeman, McRae, Sealy & Laughlin, W. B. Browder, Jr., Durward M. Goolsby, and Milton L. Bankston, Midland, for petitioner.

Jones & Milstead, Guilford L. Jones, Big Spring, for respondent.

GREENHILL, Justice.

The application for writ of error was granted in this case dealing with adverse possession of grazing land to determine if there was evidence to support the findings of the jury, and to review the treatment by the Court of Civil Appeals of a former opinion by this Court, the *Orsborn* case, [Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781] dealing with "casual fences."

The suit was brought by Butler in trespass to try title to 157.22 acres of surface estate in Glasscock County. A portion of the land purchased by Butler had been occupied by the defendant Hanson and his predecessors for over 30 years and used by them for grazing purposes. This por-

tion of the land had been enclosed with over approximately 1,000 acres of Hanson lands as a part of the Hanson ranch; and this portion of the ranch, including the land in controversy, had been surrounded by a substantial fence.

The jury answered the adverse possession issues favorably to Hanson. Judgment was rendered that the plaintiff Butler take nothing. The Court of Civil Appeals sitting at El Paso affirmed. 432 S.W.2d 559.

After a careful review of the evidence and the authorities, we are of the opinion that the case has, in substance, been properly decided by the Court of Civil Appeals; and accordingly, we affirm its holdings on the major points at issue. Because of an erroneous and apparently inadvertent inclusion in the judgment of the trial court of a small portion of Butler's land lying outside of Hanson's fence, the judgments below are reversed, and the cause is remanded to the trial court with instructions to correct its judgment.

The land in this area of Western Texas was laid off in sections a mile square which were supposed to contain 640 acres each. The Hansons owned, among other lands, Section 46. Immediately to the south of Section 46 is Section 3, the surface of which was purchased by Butler in 1963 from some people named Nunn. The problem was the boundary line between Sections 46 and 3. The Hansons, according to the testimony, were of the opinion that Section 46 extended to the south to the "Hanson fence." A survey map prepared for Butler shortly before he purchased the land shows that the fence is on Section 3; and this encroachment on Section 3 is the subject of this litigation. The survey map prepared for Butler is set out in the dissent hereto and in the opinion of the Court of Civil Appeals at page 561 of 432 S.W.2d. Appended to this opinion is a crude drawing made at the trial by Bud Hanson. It sets out his rough understanding of the boundaries of the sections, and his fences are indicated with X marks in the boundaries.

The jury found that Hanson, or those under whom Hanson deraigned title or possession, had had adverse possession of the land in controversy, using the same, for a period of ten years or longer, prior to December 28, 1962; that the land had been kept enclosed during such period by a substantial fence, capable of turning livestock; that the fence was maintained for the purpose of establishing and maintaining exclusive possession and control of the land in controversy under a claim of right.

As above noted, the jury was asked about ten or more years of adverse possession prior to December 28, 1962. On that date, Hanson signed an affidavit for Butler in which Hanson said that a part of Section 3 (purchased by Butler a month later) might be within his fence, that he owned no part of Section 3 and claimed no interest therein. The jury found that on that date, December 28, 1962, Hanson was not making a claim of right to that part of Section 3 within his fence. It also found that Hanson did *not* conceal from Butler his claim of right to that part of Section 3 within his fence, and that Butler had the means of readily ascertaining Hanson's claim of right. The effect of this affidavit will be discussed later herein.

■ The main attack on the jury findings of Hanson's adverse possession is that there is no evidence to support the findings. In such a situation, it is our duty to view the evidence in its most favorable light, considering only the evidence and inferences which support the findings, and rejecting the evidence and inferences which are contrary to the findings. Cartwright v. Canode, 106 Tex. 502, 171 S.W.2d 696 (1914); Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609 (1950); Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d 508 (1947); Robertson v. Robertson, 159 Tex. 567, 323 S.W.2d 938 (1959); and Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Texas Law Review 361 (1960).

Much of the evidence supporting the jury's verdict of adverse possession is set out in the opinion of the Court of Civil Appeals. We here supplement those facts by referring specifically to some of the testimony.

Bud Hanson, who was 60 at the time of trial, had been familiar with the land all his life. He remembered the fence in question as being where it was since 1914. In 1932, Bud's father had leased 11½ sections, including the Section 46 in question to a tenant, Clyde Berry, who testified at the trial. As will be noted below, Berry maintained the fences, including the one in question. Bud had lived on the land with his mother and father in 1934 and 1935. He testified that in the early '30's, in 1934, "We put a net fence around the whole ranch. 'We' were my dad and me and 2 or 3 men, my brothers-in-law." The net fence was added to the three-strand barbed wire because "I wanted to put up a better fence to hold sheep."

Hanson testified he "heired" Section 46 in 1958 and got a deed to Sections 46 and 2 from his family in 1949. In the period between 1949 and 1952, he rebuilt the fences, put a new fence post between each of the old posts and had continuously maintained them. The land inside the fences was continuously used for grazing; that there never had been a time since 1932 that he had quit using what he called his "Section 46"; i. e., the land down to the fence in question.

Hanson repeatedly testified that he regarded this south fence to be his south line, the line between Sections 46 and 3. He intended to include it within his fence and use it. He said he didn't own Section 3 and did not claim it but, "I'm going to claim what is in my fence."

"Q: You are going to do that [claim it] even if it is in Section 3?

"A: Sure, it's been there for 60 years.

"That fence has been there all my life, ever since I was 10 years old. I suppose— I supposed it was my property. * * * I claim all of 46, you bet'che."

"Q: * * * Insofar as this tract of land is concerned that you call 46, what do you claim * * * ?"

"A: I claim all that is inside my fence. * * * I run stock on it and maintained the fences, and I figured it was mine. * * *"

When he repaired his south fence he knew what section he was in; "I knew it was mine, yes."

"Q: Did you know whether any part of it might include a part of Sec. 3?

"A: No sir.

"Q: Did it make any difference to you?

"A: No it didn't it was my fence line.

"Q: Are you claiming all of Section 46 whether it's in your fence or not?

"A: I'm claiming all that is in my fence. * * * I'm claiming what is inside, what is inside that fence."

Clyde Berry the Hanson's tenant from 1932 to 1952, testified that he was familiar with the land from the highway to the north down to the south fence "that we call Section 46." He had worked the land 20 years. He regarded the land north of the fence as Hanson's land, and the land south of the fence as belonging to the Nunns. The fence had never been changed in the 20 years he had been on the place. The general reputation in the community was that Mr. Hanson [Senior] owned from the highway at the north of Section 46 down to that fence; and that it was Bud Hanson's "since he got it." He never heard anything to the contrary until Mr. Butler showed up [in 1962]. The fences were there before he took the lease in 1932. He didn't know who put them up.

The person who had actually occupied the land in Section 3 south of the Hanson fence was Jack Cook, a tenant. He had worked 9 sections of land in the area including Section 3. He had been familiar with the Hanson land 35 or 40 years. He was familiar with the south line of Bud Hanson's place. He had worked the land south of the fence from January of 1951 to 1963 when Butler took over. He had seen Bud Hanson put new posts between the old posts, and some additional stakes in between. "It was a net fence with 3 barbed wires over the top." During the years he worked the Nunn place, the Hanson place, referred to as Section 46, was always in use. The general reputation in the community was that the property from the highway at the north down to that fence was "The Hanson Place." He had never heard of it belonging to anyone else, and he had worked the land 12 or 13 years.

In our opinion, the above is at least "some evidence" of adverse possession and a claim of right that the Hansons claimed everything within their fence, including the land in question. Sanders v. Worthington, 382 S.W.2d 910 (Tex.Sup.1964); Catching v. Bogart, 138 S.W.2d 245 (Tex.Civ.App. 1940, writ refused); Pasha v. Schell, 229 S.W.2d 818 (Tex.Civ.App.1950, writ refused); Wilburn v. Abercrombie, 125 S.W. 2d 408 (Tex.Civ.App.1939, writ refused); Major v. Meyers, 111 S.W.2d 1184 (Tex. Civ.App.1937, no writ).

We agree with the Court of Civil Appeals that the fence between Sections 46 and 3 was not a "casual fence" under Orsborn v. Deep Rock Oil Corp., 153 Tex. 281, 267 S.W.2d 781 (1954). It is true that there is no testimony as to who built the fence. There is no testimony that the elder Hanson, who was dead at the time of trial, did not build it; and his tenant, Clyde Berry, testified that the fence, which joined with other fences to make the enclosure, was there when he went into possession in 1932 and had been there ever since. Bud Hanson testified, as set out above, to the changing of the fence to a "net fence" in 1934, and his putting new posts around the ranch, including the fence in question, in the period between 1949 and 1952.

While the opinion of the Court of Civil Appeals adequately distinguishes the *Orsborn* case, we might emphasize these ele-

ments: in *Orsborn,* cattle only occasionally strayed down to the 57 acres in question, whereas here, there was testimony that this land was constantly used for grazing. In *Orsborn* between the land unquestionably owned and that claimed by adverse possession, there was a 60 acre tract, unfenced, that belonged to the State of Texas; so the adverse possessor had to skip an unfenced tract to claim the 57 acres. Here the tracts are contiguous and were operated as a unit. In *Orsborn,* the adverse possessor simply made use of the fence somebody else built. Here, as set out above, the character of the fence was changed to a "net fence" and new posts put between each old post which would certainly be evidence that Hanson had made it his fence. And finally, the undisputed evidence, not only from Hanson, but from the tenants on both sides of the fence (Jack Cook and Clyde Berry) was that this fence was *Hanson's* fence, and that the general reputation in the community was that the property down to that fence was Hanson's property.

We turn now to the effect of Hanson's affidavit of December 28, 1962. It was gratuitously executed. Butler said he explained that there was an encroachment and drew Hanson a little map. Hanson denied that Butler made this explanation or drew him any map. He said that Butler, a stranger to him, came to him to say that he was buying the surface of Section 3 and needed the affidavit to get a bank loan.

■ The affidavit was, of course, admissible on the question of Hanson's claim to the land within the fence; and, under the trial court's charge, it stopped the running of limitations. It was for the jury to determine whether Hanson, under his testimony set out above, had claimed the land as his own under a claim of right for a period of 10 years or more prior to December 1962.

■ On the other hand, if title by limitations had already been perfected in Hanson, the affidavit would not serve the purpose of a conveyance of Hanson's title or defeat his title by limitations. The latest

opinion of this Court on this point is Republic National Bank of Dallas v. Stetson, 390 S.W.2d 257 (Tex.Sup.1965). In that case, the adverse possessor, after the running of the period for title by adverse possession, signed a written acknowledgment of tenancy; i. e., that he had held the land as the tenant of the true owner, Wirt Davis; that he was not then occupying, and never had occupied or claimed any lands in that county adversely to the claim of Wirt Davis; that he knew of no one who had asserted any such claim against Wirt Davis; and that he "makes no claim to any right, title or interest to any part" of the land in controversy.

After carefully reviewing the authorities, this Court, quoting from an earlier opinion, summarized the rule as follows:

"A limitation title once consummated, is as full and absolute as any other perfect title, and it is not lost by a subsequent oral statement by the limitation owner that he never intended to claim by limitations." 390 S.W.2d 257 at 260.

Since the statement in *Stetson* was a written statement, as was the case in other opinions cited in *Stetson,* the above rule applies to a written statement; and it applies to the Hanson affidavit.

■ One point remains: there are approximately 7.34 acres of land in the northwest corner of Section 3 which are outside of Hanson's fence. Hanson did not, and does not, claim it; but for some reason, it was included in the description of the land as to which Butler "took nothing." It was agreed by counsel for Hanson on oral argument before this Court that the judgment of the trial court should be reformed to exclude this 7.34 acres. The Court of Civil Appeals declined to make this correction. Accordingly, the judgments of the courts below are reversed, and the cause is remanded to the trial court with instructions to reform its judgment so as to exclude this 7.34 acres.

Dissenting opinion by SMITH, J.

APPENDIX

FILED IN SUPREME COURT OF TEXAS JUN 4 1969 GARSON R. JACKSON, CLERK BY DEPUTY

SMITH, Justice (dissenting).

I respectfully dissent. The problem to resolve is not where is the boundary line between Sections 46, owned by Hanson, and Section 3, a part of which was purchased form the Nunns by Butler on February 15, 1963. The sole question is whether or not there is any evidence that Hanson has for a period of ten years or longer made "an actual and visible appropriation of the 157.22 acres of Section 3 under a claim of right in compliance with the statutory requirements contained in Articles 5510 and 5515, Vernon's Annotated Civil Statutes." Hanson admits that at the most he is only entitled to 149.88 acres. For a better picture of the location of the surveys involved, a plat is appended which accurately shows that 149.88 acres of the land in controversy (the 157.22 acres claimed by Butler) is fenced in with Section 46, owned by Hanson. The north boundary line of Section 3 is the south line of Section 46 and is shown on the plat as the line extending from A to B. It is admitted that there has never been a fence separating one tract from the other. Article 5515, *supra* provides: " 'Adverse Possession' is an actual and visible appropriation of the land, commenced and continued under a *claim of right inconsistent with and hostile to the claim of another."* Emphasis added. This means that there must be some evidence of probative force showing that Hanson has for the required period of time commenced and continued possession under a claim of right *inconsistent with and hostile* to Butler. There is no evidence of a "claim of right", as will be pointed out in detail later in this opinion.

For the moment, it is necessary to state that Butler filed this suit in trespass to try title on June 22, 1965, after his purchase by deed from the Nunns on February 15, 1963. Hanson admits that Butler discharged his burden in proving a record title. Therefore, Hanson makes no contention and there can be no basis for any holding that the "take nothing" judgment rendered by the trial court against Butler should stand because of Butler's failure to discharge his burden. Hanson did not file a cross action to establish title to the 149.88 acres under fence. He joined issue by pleading not guilty and the Three, Five, Ten and the two Twenty-Five Year Statutes of Limitations of the State of Texas, as a bar to plaintiff's cause of action. The Texas Ten Year Statute of Limitations only is involved. Butler does not deny that occupancy and possession has been shown, but, he does contend that Hanson had *no knowledge* that the 149.88 acres of Section 3 was under fence and that mere occupancy of land *without intention to appropriate it will not support a title under the Ten-Year Statute of Limitations.*

In response to defendant's pleas of limitations, the plaintiff pleaded estoppel on the ground that by his own acts and conduct, especially the act of disclaiming in writing that he claimed any interest in the land involved. By motion for judgment after both parties had rested; motion for judgment after verdict; motion for new trial; points in the Court of Civil Appeals; motion for rehearing in that court; and, points and argument in this Court, the plaintiff, Butler, has consistently contended that the action of the trial court and the Court of Civil Appeals erred in failing to sustain his respective motions and points, which carried forward to this Court the contentions that (1) Butler had shown and established a record title to the 157.22 acres described in his pleadings; (2) Defendant, Hanson, has not shown any record title to any part of Section 3; (3) Defendant has not shown any evidence of adverse possession as required by Article 5515, that is, the ten-year statute of limitations; (4) the defendant failed to prove a "claim of right", in that, he failed to show that his entry upon Section 3 was with the intent to claim the land as his own and to hold it for himself to the exclusion of all others and, (5) in failing to find that Hanson was estopped to claim that he actually had a claim of right to any land within Section 3.

It is argued that, although Butler pleaded estoppel, the point was not properly preserved. I cannot agree. Butler not only pleaded estoppel, but in the various motions above mentioned, he used the terms "estoppel", "disclaimer", "non-claim", "waiver", "judicial admissions" and "admissions against interest" in connection with his argument that his motion for judgment should have been granted. The theory of estoppel has never been abandoned. Butler's motion for judgment after verdict in stating what is meant by the statutory "claim of right", also stated the theory of estoppel. Therefore, the rule in Theriot v. Smith, (Tex.Civ.App.1953) 263 S.W.2d 181, applies here. Paragraph F. of this motion reads:

"F. The 'claim of right' to which the statute refers means that the entry of the limitation claimant must be with intent to claim the land as his own, to hold it for himself to the exclusion of all others. This 'claim of right' is an essential element of adverse possession. This claim of right has not been proven in this case,, and in fact the testimony of Hanson is that there was no such claim of right, because Hanson unequivocally swore from the witness stand that he never owned or claimed any part of Section 3, and that his affidavit and the statements therein to the effect that he never owned or claimed any part of Section 3 still remains true and correct. In this connection the defendant Hanson testified that he did not know where the section line was; that is, that he did not know the south line of Section 46 or the location of the north line of Section 3, and that he never knew that any part of Section 3 was enclosed within his fence, and that in any event he never claimed any part of Section 3. This is and constitutes a judicial admission. This is a repetition of the affidavit of the defendant Hanson, which also in itself constitutes an admission against interest. *When repeated from the witness stand and recognized and reaffirmed as the truth constitutes a judicial admission.*

*With this judicial admission of non-claim the jury can find no answer to any issue concerning adverse possession that the defendant Hanson actually had a claim of right to any land within Section 3."* Emphasis added.

It is important to note that the defendant, Hanson, gained title and the right of possession to the adjoining Section 46 by deed dated June 3, 1949 from his parents. The parents only conveyed Section 46 to their son and made no conveyance of any part of Section 3. If the parents ever claimed title by adverse possession there is no evidence of probative force showing such fact. There is no evidence that the parents established a limitation title *by use, claim and possession* of any part of Section 3. Therefore, in considering the question for decision, the evidence conclusively confines Hanson to the period of time from June 3, 1949, the date of his deed, and either the date of December 28, 1962, the date of the affidavit; the date of the Butler purchase from the Nunns—February 15, 1963, or June 22, 1965, the date Butler filed this suit. There is no privity of estate between Hanson and his parents, as required under Article 5516, Vernon's Annotated Civil Statutes.

The trial court, in its charge, defined "peaceable possession", "adverse possession," "claim of right" and the term "hostile". General and specific issues were submitted. The general issue reads:

"Do you find from * * * the evidence that the defendant, * * * or those under whom Hanson deraigned title or possession either in person or through a tenant or tenants, or partly in person and partly through a tenant or tenants, have had and held peaceable and adverse possession of the land in controversy in this suit, cultivating, using and enjoying the same for any period of ten years, or longer, prior to December 28, 1962?

The jury answered: "Yes."

One of the specific special issues submitting only the question of "claim of right", reads:

"Do you find from * * * the evidence that at the time Hanson signed his affidavit of December 28, 1962 *he was making a claim of right to that part of Section 3 within his fence?*"

The jury answered: "No."

Other specific findings of the jury on the question of claim of right were that Butler relied on Hanson's affidavit that Butler had the means of readily ascertaining Hanson's claim of right and did not fail to exercise such means.

It is well settled that an adverse claimant must establish "a claim of right" which includes an intent to claim land adversely to the true owner. All of the evidence shows that Hanson had no knowledge that a part of Section 3 was under the same fence with Section 46. I now point out evidence which shows that Hanson purchased and went into possession under a deed which described only Section 46. Hanson's testimony is that he had no knowledge that a part of Section 3 was fenced with Section 46 until Butler approached him in regard to whether he, Hanson, claimed the land later purchased by Butler. Hanson consistently maintained that he only claimed Section 46. Each time inquiry was made during the trial, Hanson unequivocally confined his claim to the land described in his deed. At most, the evidence reflects that Hanson mistakenly believed that his Section 46 extended to the fence line. It would unduly lengthen this opinion to quote all of the evidence which amounts to "no evidence" to support the answer to the general issue, but, on the other hand, shows that at no time was Hanson "making a claim of right", as found by the jury in answer to the specific issues as to "claim of right." There is no evidence of any verbal claim

of ownership of any part of Section 3; no evidence of rendition for taxes; no mention of this land is contained in the estate preceedings of Hanson's predecessor in title, Will Hanson; no evidence that Hanson executed any conveyances or instruments affecting or describing any part of the land in controversy, although he executed oil and gas leases and right of way deeds covering Section 46. He did execute an easement conveyance across Section 46 so that Butler could construct and maintain a road from the State Highway to Butler's land; this easement described no land in Section 3. As to this grant, Hanson gave testimony which makes it clear that there is no evidence of a "claim of right" by Hanson. Such testimony follows:

"One of the conveyances the respondent executed pertaining to Section 46 was an easement which he sold to the petitioner for the purpose of allowing the petitioner to construct and maintain a road from the State Highway to petitioner's land. This easement describes no land in Section 3; however, as to the intentions of the respondent as to this grant, he testified:

"Q * * * you still mean to give Jim Butler a right-of-way to his land, don't you?

"A He has got the easement, yes.

"Q That is what you meant to give him, isn't it?

"A That's right.

"Q And if Section 3 extends within your fence you meant to give him an easement to that section regardless, didn't you?

"A He has got the easement *to the section.*

"Respondent testified he thought the fence line drawn on the plat as line I to F was on the south line of Section 46; that he

was unaware that any of Section 3 was within his fence. He said:

"Q  That is 46 you mean to include in your fence, isn't it?

"A  Well, it's fenced.

"Q  Is there any fence on what Mr. Baker has shown as the south line of 46?

"A  I don't know. I ain't got none there. I have got a south fence on 46.

"Q  That fence—the fence is on the south line of 46 as known to you, isn't it?

"A  That's right.

"Q  If your land—if your fence there on Section 46 includes land in Section 3 you don't know—you didn't know it over the years, did you?

"A  No, I didn't know it. The fence has been there all my life.

"Q  But my question was—I think you answered it fairly—you didn't know it, did you?

"A  No.

"Q  Did you know whether any part of it might include a part of Section 3?

"A  No, sir.

"Q  Do you know whether the fence was on Section 3 or on 46 or where it was with respect to the section line?

"A  Well, I presumed it was on 46, it had been there so long.

"Q  But you didn't actually know one way or another?

"A  Sure didn't.

"The extent of Hanson's claim to Section 3 is embodied by the following testimony solicited by his attorney:

"Q  So far as claiming it, Bud? That is what I am asking about. What do you mean when you say you claim it?

"A  Well, I run stock on it and maintain the fences, and I figured it was mine, it was in my fence line.

"Remarkably, his intentions four years later, at the time of trial, were the same. He testified:

"Q  And you have never gotten any deed or title instruments by such as a deed or contract for a deed to Section 3, Block 35?

"A  No.

"Q  And you don't claim to have, do you?

"A  I don't know nothing about Section 3.

"Q  Have you ever put a sign up on this Section 3 up until the last year or two?

"A  I have never put a sign on 3. I put one on 46.

"Q  Where?

"A  All over it, both gates, every gate I have.

"Q  But not on 3?

"A  I don't know nothing about 3, it don't belong to me.

"Q  And you don't want it?

"A  No, I don't want 3, I don't guess I'd get it if I wanted it.

"Q  You have never intended to pay any taxes on any land in Section 3, have you?

"A  I don't own it, why should I be paying taxes on it? If I owned it, I'd pay them.

"Q  You don't claim any land in Section 3, do you?

"A  No.

"Q Sir?

"A No, sir.

"Q You do remember it did not cover Section 3, don't you?

"A No, sir.

"Q It did not, did it?

"A No, sir, I don't own Section 3.

"Q And you didn't intend to give a lease to any part of Section 3 whether it was in your fence or not, did you?

"A I don't own Section 3, I wouldn't be leasing another man's property.

"Q Let's answer my question. Now, you did not intend to give a lease on Section 3?

"A No, sure didn't.

"Q Whether it was in your fence or out of your fence, did you?

"A I don't own Section 3, I wouldn't lease it.

"It is to be noted the identical factual situation exists as relates to the fence line between Section 46 and Section 47 (owned by Hanson's sister), that is, part of Section 47 is within the fences of Section 46. To this land Hanson testified he made no claim by adverse possession to any portion of his sister's land, although his use of the land is the same.

"Prior to the time the petitioner purchased Section 3 the respondent disavowed any claim by the execution of the following affidavit:

"STATE OF TEXAS ⎫
"COUNTY OF GLASSCOCK ⎭

"Before me, the undersigned authority, appeared L. H. (BUD) HANSON, who, being by me first duly sworn, stated:

"My name is L. H. (Bud) Hanson and I reside in Glassock County, Texas. A part of Section 3, Block 35, Township 4 South, Glasscock County, Texas, might be enclosed within the boundary of my fence. I own no part of said Section and claim no interest therein.

"/s/ L. H. Bud Hanson

L. H. (Bud) Hanson" [1]

In view of all the evidence, including Hanson's judicial admissions, Butler's motion for judgment after verdict should have been granted.

Hanson admits that his first knowledge that a part of Section 3 was under his fence was when Butler told him just prior to the execution of the above affidavit. The jury found that Hanson was not "making a claim of right" to that part of Section 3 within his fence and knew that Butler was intending to use the affidavit in closing the purchase from the Nunns. On the strength of this positive written proof of non-claim, Butler purchased the land for a consideration of $16,000.00.

No reliance can be given to the statement of the evidence of adverse possession set out in the opinion of the Court of Civil Appeals. The intermediate court's opinion makes no reference to the evidence bearing upon the claim of right question or estoppel. From my viewpoint, this Court should take into consideration three key dates, i. e., June 3, 1949, December 28, 1962 and February 15, 1963. The Court of Civil Appeals rejected petitioner's contention of no evidence of knowledge that the 149.88 acres of Section 3 was under fence with Section 46, hence, no evidence of hostile claim by stating that "[a]s long as the adverse claimant was *using the land and* maintaining a fence of the nature present *here, we do not feel it was necessary* for him to have absolute knowledge that the claimed tract has been a part of Section 3." This Court has never agreed that such is the

---

1. The above affidavit was properly notarized.

law. There can be no intent to claim in this case in the absence of proof that Hanson had knowledge that the fence was on Section 3. Mere occupancy of land without any intention to appropriate it will not support the statute of limitation. Wright v. Vernon Compress Co., 156 Tex. 474, 296 S.W.2d 517 (1956); Nona Mills Company v. Wright, 101 Tex. 14, 102 S.W. 1118 (1907); Sellman v. Hardin, 58 Tex. 86 (1882).

The evidence set out in the Court's opinion amounts to no evidence. There is a complete absence of any evidence of an intention to claim the land. Intention of the possessor of land to claim it as his own is an essential element of adverse possession and in the absence of such intention the possessor cannot mature a limitation title to land belonging to another. Orlando v. Moore, Tex.Civ.App., 274 S.W.2d 86 (1955, wr. ref. n. r. e.).

Within Hanson's enclosure there are several tracts or sections of land in addition to the 149.88 acres owned by Butler. Hanson admits that he makes no claim to a part of Section 47, which is within the enclosure and owned by his sister. Thus, we have a situation where Hanson, though now claiming the land owned by Butler within his enclosure, does not claim the land owned by his sister within the same enclosure. Attention is directed to the case of Delany v. Padgett, 5 Cir., 193 F.2d 806, 810 wherein the court under a similar factual situation, held:

" 'Neither can one who, as here, runs cattle on a pasture thus enclosed, claim title by adverse possession to a particular tract when the pasture contains many tracts of land held under separate ownerships and distinct chains of title, as to some of which he recognizes the title of the owner, merely because this tract is included in this general enclosure. * * *

" 'Under testimony of this kind, in order to start limitation running as to tracts situated with reference to the enclosure, as plaintiffs' land is, it would be essential that it be possessed, used, and cultivated in such a way as to unequivocally give notice of defendant's adverse claim to it, as distinguished from other lands in the same pasture as to which he admits he was making no claim.' "

The writer is of the view that the case of Brohlin v. McMinn, 161 Tex. 319, 341 S.W.2d 420 (1960) is directly in point on the question we have here. In that case, Brohlin was seeking title and possession by virtue of adverse possession under the Ten Year Statute of Limitations. Brohlin was claiming the south six feet of Lot 10, which adjoined Lot 9, located in an addition to the City of Amarillo. The question: Was the fence located on Lot 9 or Lot 10? This Court, in holding that Brohlin had complied with all of the statutory requirements contained in Article 5510, based its conclusion upon the fact that it was uncontroverted that Brohlin had personal knowledge of the location of the *property* and the *fence* and that Brohlin unequivocally stated that the *fence* had included the six foot strip off of Lot 10 for 24 years. Thus, it is clear that our decision turned on the fact that Brohlin *knew* from the beginning that the fence was located on Lot 10. We, in effect, said in *Brohlin* that without knowledge of the location of the fence on Lot 10, there would have been no evidence of exclusive, peaceful and adverse possession of the land under a *claim of right* for a period of not less than ten years.

It is argued that the answer of the jury that Hanson was not "making a claim of right" to Section 3 on December 28, 1962, is not controlling because the issue was limited to that date only. This can not be so in view of the evidence given by Hanson himself that he never at any time claimed any part of Section 3. Neither Hanson nor his parents built the fence in question. They did repair the existing fence, but at no time did Hanson know that

the fence included a part of Section 3. The sole use of the land was grazing. "No matter how exclusive and hostile to the true owner the possession may be in appearance, it can not be adverse unless accompanied by the intent on the part of the occupant to make it so. *The naked possession unaccompanied with any claim of right will never constitute a bar.* Houston Oil Co. v. Stepney, 187 S.W. 1078, 1084 (Tex.Civ.App.1916, wr. ref.), quoted with approval by this Court in Orsborn v. Deep Rock Oil Corporation, 153 Tex. 281, 267 S.W.2d 781 (1954)." Emphasis added. The essential element of "claim of right" is completely lacking in our case and the jury has so found. While I do not agree that the finding of the jury to special issue 1 is supported by evidence, it is my view that, in any event, the specific finding of no "claim of right" controls over the general finding. Hodges on Special Issues in Texas, Section 55, pp. 140 et seq.

The holding in the case of Republic National Bank of Dallas v. Stetson, Tex.Sup. 1965, 390 S.W.2d 257, has no application here. In that case, this Court rejected the contention of the bank that two acknowledgments of tenancy by one who had perfected title by limitation were ineffective to defeat a limitation title. In our case, Hanson disclaimed in writing and reaffirmed on the witness stand that he did not own and had never claimed any part of Section 3, Block 35, Township 4 South, Glasscock County, Texas, which "might be enclosed within the boundary of my fence." Hanson executed this disclaimer before Butler purchased the land from the Nunns for $16,000.00 and reaffirmed his disclaimer in the trial of this case. Incidentally, the definition of "claim of right" and the special issue given in *Stetson* were not subject to the objections lodged against the instruction and issue in the present case. In the *Stetson* case, Stetson testified that he signed the acknowledgment of tenancy without reading it;

he did not know that he was acknowledging himself to be a tenant; Mr. Davis II, representing the bank, told him that the acknowledgment did not apply to his home place; and, that he trusted Mr. Davis. We have no evidence of this type here. As heretofore mentioned, the jury, in answer to the only "claim of right" issue that confined the question to the claim, if any, of Hanson, failed to find that Hanson was making a claim of right to the land in controversy. The date of December 28, 1962, was used in the issue just as it was in issue number 1, quoted above. There is no way that Hanson should legally escape the effect of his testimony, and disclaimer.

Finally, Butler presents two alternative reasons why this Court should reverse the judgments of the lower courts and remand the cause to the trial court for a new trial *in the event it concludes not to reverse and render.* I agree with both contentions. The Court remands the cause to the trial court with instructions that the judgment be reformed to exclude the 7.34 acres not within the enclosure. This Court is without power to divide the 157.22 acres into two tracts. The verdict of the jury is indivisible. The land in controversy is a tract of 157.22 acres. Hanson admits in his brief in the Court of Civil Appeals that the judgment that Butler "take nothing" is without support in the evidence. Hence, Hanson prays that the judgment be reformed to exclude the acreage without his fence. Under the circumstances, the verdict is an entirety and if any part of it is set aside, the entire verdict falls. North v. Atlas Brick Co., 13 S.W.2d 59 (Comm.App.1929). *North* involved a similar situation as presented here. In that case, the Court, in reversing the judgment of the Court of Civil Appeals, said:

"Such a complaint is far-reaching and challenges the integrity of the verdict as a whole.

"Under our system, the verdict is an entirety, and, if any part of it is set aside, the entire verdict falls. The judgment must in all cases conform to the verdict, and there can be but one final judgment in any case, and it necessarily follows there can be but one verdict and that the judgment must follow that verdict as returned, unless the same in its entirety be set aside. It is not permissible to set aside the verdict in part and to render judgment upon that which remains. This would be not only to violate the statutory rules just referred to, but would be to violate the constitutional guaranty of trial by jury. The brick company having successfully challenged the verdict in a material respect, its validity as a whole was involved, and the trial court erred in not setting the verdict aside, and the Court of Civil Appeals erred in affirming that ruling."

The second alternative point, if sustained, would require a reversal of the entire cause and the entry of judgment remanding the cause for a new trial. The point: "The Court of Civil Appeals erred in failing and refusing to hold that the trial court's definition of 'claim of right' was insufficient in law as applied to the facts of the case."

In my opinion, the point should be sustained. The definition of "claim of right" and the form of issue no. 1 together are misleading in that the jury was lead to believe that it could take into consideration the possession of Hanson's predecessors in title to Section 46, when, there is no evidence of any claim to Section 3 by Hanson's parents.

Special issue no. 1 reads: "Do you find from * * * the evidence that the defendant, L. H. (Bud) Hanson, or those under whom Hanson deraigned title or possession either in person or through a tenant or tenants, or partly in person and partly through a tenant or tenants, have had and held peaceable and adverse possession of the land in controversy in this suit, cultivating, using or enjoying the the same for any period of ten years, or longer, prior to *December 28, 1962?*" Emphasis added. To aid and govern the jury in answering special issue no. 1, the Court gave among others, the following instruction: "By 'claim of right' as that expression is here used, is meant a claim with the intent to claim the land as his own, and to hold it for himself." Objections were made to the instruction and the issue on grounds that there was no testimony that Hanson deraigned title or possession of the disputed tract of land from any person; there was no testimony showing any conveyance of title from any predecessor to Hanson; there was no testimony that Hanson deraigned title either in person or through a tenant or tenants, or partly in person and partly through a tenant or tenants. This writer agrees with Butler that the instruction and issue concerning Hanson's possible deraignment of title from some other person was confusing and prejudicial to Butler. This is especially true where there was no conveyance by deed or otherwise of the 157.22 acres from Hanson's parents to Hanson. The charge allowed the jury to base its affirmative answer to issue no. 1 on some type of possession by Hanson's parents when the issue should have been confined to whether the defendant, Hanson, made or had such claim of right, etc. The record is void of any evidence showing the intention of Hanson's parents to claim the land in controversy. It is equally true that there is no evidence that Hanson ever formed an intent to claim the land until after Butler informed him that the fence was located on Section 3.

The judgments of the trial court and the Court of Civil Appeals should be reversed and judgment here rendered that Butler recover title and possession of the land described in his petition. In any event, Butler's prayer for alternative relief should be granted and the entire cause remanded to the trial court for a new trial.

APPENDIX

PLAT

OF

A SURVEY OF SECTION 3, BLOCK 35, TSP.-4-SOUTH,
T. & P. R.R. CO. SURVEYS, GLASSCOCK COUNTY, TEXAS.

(S.F. 34-35; Ex. 21.)

[A1900]