**GARNER MOTORS, INC., Appellant,**

v.

**W. A. INNES, Appellee.**

**No. 8397.**

Court of Civil Appeals of Texas,
Amarillo.

Dec. 17, 1973.

Rehearing Denied Jan. 14, 1974.

Stokes, Carnahan & Fields, Barry D. Peterson, Amarillo, for appellant.

Walter P. Wolfram, Amarillo, for appellee.

ELLIS, Chief Justice.

This is an appeal from a judgment entered against Garner Motors, Inc., an authorized Oldsmobile dealer, for the alleged conversion of a 1970 Oldsmobile Toronado automobile which the owner, W. A. Innes, had delivered to the dealer for repairs. After being advised by the dealer that, because of the owner's alleged misuse of the automobile, the cost of the repairs would not be covered by either the dealer's warranty with respect to previous work and repairs or by the factory warranty, the owner demanded the return of the vehicle. When the owner refused to pay certain charges for disassembling the engine, the dealer retained possession of the automobile. The dealer's refusal to return the automobile resulted in the conversion suit. Upon a jury's verdict favorable to the owner, the trial court rendered judgment against the dealer. Affirmed.

Subsequent to his purchase of the 1970 Oldsmobile Toronado from the former owner, Tom Collier, Innes made application to, paid for, and secured from Garner Motors, Inc., sometimes referred to as "Garner," a factory "second-owner" warranty on the automobile. Garner stipulated that it was at all times pertinent an "authorized Oldsmobile dealer," and that the relevant transactions happened at Garner's place of business in Amarillo, Texas.

After encountering some problems with the automobile, particularly overheating and the emitting of white smoke from the exhaust, Innes took the Toronado to Garner for repairs on September 24, 1971. At that time Garner's mechanic removed both cylinder heads, replaced the head gaskets and replaced the right cylinder head after discovering that it was cracked. Before replacing the left cylinder head, it was "surfaced" and magnafluxed to test for any defects, and the Garner mechanic testified that no defects were found. Payment of the charges for the September 24, 1971 work and repairs was made pursuant to the Oldsmobile second-owner factory warranty. The factory warranty involved provides, in part: "Oldsmobile . . . warrants . . . it will repair or replace . . . any parts of each new 1970 Oldsmobile . . . which are returned to an authorized Oldsmobile dealer . . . which examination discloses to Oldsmobile's reasonable satisfaction to be defective in material or workmanship under normal use and service. Such repairs and replacements shall be performed *by such dealer* without charge." (emphasis added).

Also, there is testimony in the record to the effect that, in addition to the factory warranty, the work and repairs were covered under Garner's dealer warranty whereunder Garner's workmanship or material or parts "put on a car are guaranteed for 90 days or 4,000 miles, whichever occurred first." On December 15, 1971, approximately two months and twenty days after the September 24, 1971 repairs, Innes again encountered problems with the automobile's heating and emission of white smoke from the exhaust. He took the automobile to Garner Motors and was informed by the service adviser that it appeared that the dealer's 90 day warranty would cover the cost of labor and repairs if the problem was due to Garner's workmanship or materials. On this occasion Garner's mechanic removed the left cylinder head and found it to be cracked.

Thereafter, Garner's representative informed Innes that payment for the required labor and repairs would not be covered under either the second-owner war-

ranty or Garner's 90 day dealer's warranty because they had determined that the automobile had been mistreated. Innes demanded the return of his automobile, and he was told that it would be returned upon his payment of $45.00 to Garner for disassembling the engine. Innes refused to pay the charges, Garner retained possession of the automobile, and the conversion suit was filed and subsequently tried. Judgment for the sum of $4,050.00 was entered against Garner who brings this appeal upon three points of error.

Garner contends in its first two points of error that there is no evidence or, in the alternative, insufficient evidence to support the jury's answers to Special Issues Nos. 1, 1A and 1B. These issues and answers are:

### "SPECIAL ISSUE NO. 1

"Do you find from a preponderance of the evidence that the work done by Garner Motors, Inc. on or about December 15, 1971, was caused by a defect in work done by Garner Motors, Inc. on or about September 24, 1971?"

\*   \*   \*   \*   \*   \*

"ANSWER: Yes.

### "SPECIAL ISSUE NO. 1A

"Do you find from a preponderance of the evidence that the problem for which the vehicle in question was returned to Garner Motors, Inc. on December 15, 1971, was caused by a defect in material or workmanship in the vehicle under normal use and service?"

\*   \*   \*   \*   \*   \*

"ANSWER: Yes.

"If you have answered the foregoing 'yes', then answer the following.

### "SPECIAL ISSUE NO. 1B

"Do you find from a preponderance of the evidence that such condition should have been reasonably apparent to Oldsmobile representatives?"

\*   \*   \*   \*   \*   \*

"ANSWER: Yes."

In considering the evidentiary support for the jury's responses to the above inquiries relating to mechanical problems experienced with the 1970 Oldsmobile Toronado, we deem it appropriate to review those portions of the evidence relating specifically to (1) the circumstances and manner of performance of the workmanship along with the type and quality of parts and materials related to the problem involved; and (2) conditions regarding the use and service of the vehicle during the period in question. All of these matters relate to basic questions as to whether the defect or problem with the engine was caused by the owner's mistreatment, or was covered by the "second-owner" warranty or the dealer's 90 day work and parts warranty.

Regarding the workmanship, there is a conflict in the testimony as to the proper procedures for repairing the engine when it was brought to the dealer on September 24, 1971. The mechanic who worked on the Oldsmobile when it was brought in with the problems on September 24, 1971 testified as to the procedures he followed, including the removal and replacement of the cracked right cylinder head, along with other work performed on this occasion. Innes, the owner, testified that he had 20 years experience as a mechanic. His testimony was to the effect that, in his opinion, Garner's mechanic had improperly replaced the head and gasket on the left side of the engine when the work and replacement was performed on September 24, 1971. He stated that at that time there was nothing wrong with the left cylinder head and that, as a result of the failure on the part of Garner's mechanic to follow the proper pre-testing procedure, the left cylinder head was unnecessarily removed. Innes further testified that the proper procedure

for replacing a cylinder head was to tighten the head in place while the engine was cold, allow the engine to heat and then retighten the cylinder head. Innes stated that it was his opinion that Garner's mechanic bolted the head in place on September 24, 1971, when the engine was cold but failed to retighten it after the engine had been allowed to heat, which in turn caused the head gasket to "blow." This resulted in a "minus water" condition which caused heating sufficient to crack the cylinder head. He stated, "Had you people left the head alone . . . it wouldn't have been cracked." He further testified that heat alone would crack a cylinder head. Garner's shop foreman, Whisenhunt, testified to the effect that heat alone would not cause the cylinder head to crack and that it was not proper procedure to tighten the bolts twice. Haynes, a witness called by Innes as an expert mechanic, testified that heat was the main cause of the cracked engine head.

■ Although Haynes' testimony corroborated that of Innes in certain respects, on cross-examination he testified that in the installation of cylinder heads it was not proper procedure to tighten the bolts twice, as contended by Innes. The appellant, Garner, took the position that Innes was bound by the testimony of his witness which was in agreement with Garner's witness regarding the proper procedure to install a cylinder head. In support of such contention, appellant cites the cases of Henderson v. Mason, 386 S.W.2d 879 (Tex.Civ.App.—El Paso 1964, no writ) and Trotter v. McLennan County Water Control & Improvement Dist. No. 1, 252 S.W. 2d 734 (Tex.Civ.App.—Waco 1952, writ dism'd), which make reference to the general rule that a party is bound by the testimony of his own witness. However, it is significant that in both *Henderson* and *Trotter* not only did the plaintiff's witnesses testify adversely to the plaintiff's position, but there was an absence of competent testimony supporting the plaintiff's position. In the instant case, the plaintiff

testified that he was a mechanic of some twenty years experience and stated his opinion concerning proper procedures to be followed. His testimony was not given to impeach the testimony of Haynes as to the proper procedure in tightening the cylinder heads, but stated his opinion, as an experienced mechanic, regarding what he considered as the proper procedure in such matters. Further, it is recognized that a party calling an expert witness does not vouch for the accuracy of his opinion and is not bound by such expert's testimony. West v. Houston Lighting & Power Company, 483 S.W.2d 352 (Tex.Civ.App.—Houston (1st Dist.) 1972, no writ); Gulf, Colorado & Santa Fe Railway Company v. Abbey, 313 S.W.2d 108 (Tex.Civ.App.—Fort Worth 1958, no writ). The variance between plaintiff's testimony in certain respects and that of the witness called presents a matter of weight and credibility to be determined by the jury.

We note the following testimony given during the direct examination of witness Haynes, a mechanic with 30 years of experience, pertaining to the basic cause of the cracked engine head exhibited to him and concerning the type and quality of materials involved:

"Q. At my request during this recess, did you take a look at this engine head here?

"A. Yes.

"Q. Do you agree that this is an Oldsmobile or a General Motors Product?

"A. Yes.

"Q. . . . . Now do you find the crack or a break in this head any place?

"A. Yes, . . . .

"Q. Do you have an opinion as to what would cause a break like that?

"A. Overheating.

"Q. That would be one cause.

"A. That is the main cause. Today's high compression engines, like you said, shortage of materials; the material is not in these parts that used to be. Everything is made as cheap as it can be made. And it is thin to start with.

"Q. When you say thin, what are you talking about thin?

"A. Well, all over. Any where they cut down on the weight of it, and also on the material."

Concerning the matters of workmanship and materials, Gilley, one of Garner's mechanics, testified that generally the 1970 Oldsmobile Toronados' engines had a history of overheating. Also, there was evidence to the effect that this particular 1970 Toronado had continuous overheating problems.

As to whether the automobile had been operated under conditions of normal use and care, or had been mistreated, Garner's mechanic expressed the opinion that the left cylinder head cracked because of putting cold water into a hot engine. Innes, the owner, testified that he had never mistreated the automobile or had he seen anyone else do so. He denied that he ever put cold water in the radiator when the engine was hot and to his knowledge no one else had done so. Mrs. Innes testified that she and her husband were the only persons who had driven the vehicle and that she had never put cold water in the radiator nor has she allowed anyone else to do so.

■ The record clearly indicates that under the established procedure for handling Oldsmobile factory warranty claims, Oldsmobile would become aware of a particular defective condition, whether materials or workmanship, through inspection by the authorized dealer's mechanics. The practice, as demonstrated by the September 24, 1971 transaction, was for Garner's mechanics to make the inspection, replace parts as necessary and submit the claim for payment to Oldsmobile. In this instance the claim was honored under the factory warranty. The dealer represented Oldsmobile, not only in the matter of delivery of the warranty, but all inspection, diagnosis, repairs and replacement of parts were done by employees of Garner Motors Company, the authorized dealer. At all times material the owner's relationships pertinent to the problems with the automobile which involved any warranty, whether the Oldsmobile factory warranty or the dealer's 90 day warranty, were had with Garner motors. Thus, it is our opinion that whatever defects may have been obvious to Garner Motors, through its mechanics, were thereby apparent to Oldsmobile's representatives under the terms of the factory warranty and pursuant to the established method of operation.

In passing upon "no evidence" points, the evidence is to be viewed in a light most favorable to the jury findings of fact, considering only the evidence and reasonable inferences to be drawn therefrom in support of the finding. Transport Insurance Company v. Mabra, 487 S.W.2d 704 (Tex. 1972); Butler v. Hanson, 455 S.W.2d 942 (Tex.1970). We have carefully considered the evidence and reasonable inferences deducible therefrom in the light most favorable to the jury's answers to Special Issues Nos. 1, 1A and 1B, and it is our opinion that appellant's "no evidence" points are not sustainable.

■ In determining whether or not there is sufficient evidence to support a jury verdict, we are required to consider all the evidence, including that which is contrary to the verdict. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951). It is well established that the jurors as triers of fact are the exclusive judges of the issues of fact raised by the evidence and the inferences to be drawn therefrom. They may believe a witness although he had been contradicted, and they may believe the testimony of one witness and reject the testimony of other witnesses. Bowen v. Merritt Incorporated, 417 S.W.2d 313 (Tex.Civ.App.—Fort Worth 1967,

no writ). Here the jury was entitled to believe appellee's testimony and reject that of the other witnesses. Furthermore, the jury may reach its conclusion by blending all the evidence before it and it is not required to credit all testimony of any witness. Martin v. Gurinsky's Estate, 377 S. W.2d 710 (Tex.Civ.App.—Austin 1964, writ ref'd n. r. e.).

 From a review of the entire record, including the testimony of the various witnesses, the circumstances, and all reasonable inferences therefrom, we have concluded that there is sufficient evidence of probative force to support the jury's answers to Special Issues Nos. 1, 1A and 1B. Appellant's points of error Nos. 1 and 2 are overruled.

In its third point of error, the appellant contends that the trial court erred in failing to submit ultimate issues sufficient to warrant a judgment for the plaintiff. The complaint is made that Special Issues Nos. 1, 1A and 1B were not ultimate issues of fact. Special Issue No. 1, inquiring as to defective work done by Garner Motors, Inc., on September 24, 1971 relates primarily to Garner's 90 day dealer's warranty. Special Issues Nos. 1A and 1B, inquiring as to whether the problem for which the vehicle was returned to Garner Motors, Inc., on December 15, 1971, was caused by a defect in material or workmanship in the vehicle under normal use and service, and whether such condition should have been reasonably apparent to Oldsmobile representatives, embrace the controlling elements recited in the Oldsmobile factory warranty and the factual issues related thereto. Appellant further contends that the appellee should have requested issues as to whether or not a demand was made for the return of the automobile and whether or not such demand was refused, insisting that such issues are ultimate or controlling issues. The plaintiff's testimony is uncontroverted that he requested the return of the automobile and that such return was refused unless the

owner paid Garner charges of $45.00. The trial court is not required to submit special issues as to facts concerning which there is no controversy, and no jury finding is necessary to establish undisputed facts. Wright v. Vernon Compress Company, 156 Tex. 474, 296 S.W.2d 517 (1956). Also, see Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904 (1942). The appellant made no objection whatsoever concerning the court's failure to submit such issues. In the absence of any objection to the trial court's failure to submit an ultimate or controlling issue, or if no such issue is submitted, a jury trial on such issue is waived. See R. McDonald, Texas Civil Practice, § 12.32.2, at 421 (1970). Appellant's third point is overruled.

For the reasons above stated, the judgment of the trial court is affirmed.

ROBINSON, J., not sitting.