

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-18-00125-CV

JAMES DANIEL ROBERTS AND SHERYL A. GROSS

APPELLANTS

V.

LINDA RATLIFF, ROBERT RATLIFF, AND LEONARD RATLIFF

APPELLEES

----------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY
TRIAL COURT NO. CV15-08-554

----------

## MEMORANDUM OPINION[1]

----------

James Daniel Roberts and Sheryl A. Gross (the Couch Heirs) appeal from the trial court's final judgment (1) granting summary judgment for Linda and Robert Ratliff (the Adverse Claimants) on their trespass to try title suit against

---

[1]*See* Tex. R. App. P. 47.4.

the Couch Heirs and on the Couch Heirs' counterclaims against them and also (2) granting summary judgment for Leonard Ratliff on the Couch Heirs' third-party claims against him. Because we hold that the Adverse Claimants provided some evidence of adverse possession but not conclusive proof, and because the summary judgment motion on the Couch Heirs' counterclaims and third-party claims turned on whether the Adverse Claimants prevailed on their adverse possession claim, we reverse the trial court's judgment.

## I. Background

Leonard and his wife Margie, along with W. Z. Willbanks and his wife Irene, bought 422.17 acres of land in Wise County (the Ratliff Tract) from Marvin and James Petty in 1962. The Ratliff Tract was located to the east of what is now known as County Road (CR) 4598.[2] At that time, Elizabeth Lucille Couch (Lucille) owned land to the west of CR 4598 (Couch Tract). She also had record title to an approximately 6.54 acre strip of land running from north to south along the eastern edge of CR 4598 that immediately abutted the Ratliff Tract (the Disputed Property). The Pettys' deed to the Ratliff Tract did not include the Disputed Property in its legal description.

Lucille died in May 1998. In 2001, Derline Roberts, individually and as executor of Lucille's will, conveyed an undivided 5/12th present interest, and a 1/12th remainderman interest, in the Couch Tract and the Disputed Property to

---

[2]CR 4598 was previously known as CR 4690 and is also called Garvin Road. The terms are used interchangeably in the record.

each of the Couch Heirs and retained a 1/6th life interest. At that time, the entire Couch Tract—described as 320 acres in the 1932 deed to Lucille—was described as the surface estate to 312 acres of land[3] and the mineral interest in 320 acres of land. When Derline passed away,[4] each of the Couch Heirs thus became owner of an undivided 1/2 interest in the Couch Tract and, if not already adversely possessed by the Adverse Claimants at that time, the Disputed Property. *See, e.g.*, *Nussbaum v. Nussbaum*, 292 S.W. 189, 191 (Tex. Comm'n App. 1927).

During the 2000s, the Couch Heirs leased all of their 312 acres of surface estate to various third parties for hunting and grazing. Their unrecorded leases defined the leased premises as the 312 acres of land described in the deed to them from Derline.

Around 2008, FPL Energy Producers decided to build a pipeline in the area and sought permission for an easement to locate parts of the pipeline on the Couch Tract, Ratliff Tract, and Disputed Property. Leonard granted FPL an easement on the Disputed Property and also signed an affidavit of adverse possession claiming ownership of the Disputed Property, which FPL filed in the Wise County property records. That affidavit reads as follows:

---

[3]Gross explained in her summary judgment affidavit that eight acres of the surface estate were conveyed for the construction of Highway 114, which runs through the Couch Tract. That conveyance is not included in the record, and nothing in the record shows when this conveyance occurred.

[4]The record does not indicate when this occurred.

3

I hereby swear and affirm that I have openly, notoriously, continuously and adversely possessed the following described property without interruption since <u>1962</u> to the present date and to the exclusion of all others:

A tract of land in the Van Zandt Survey, Abstract 1182, Wise County, Texas located on the east side of County Road 4598 (formerly County Road 4690) and immediately adjacent to 104 acres owned by myself and the Margie M. Ratliff Estate recorded in Volume 662, Page 891 of the Official Public Records of Wise County, Texas.

My claim of title to this property is based upon continuous possession and use since <u>1962</u>.

I have paid the ad valorem taxes on this property continuously since <u>1962</u>.

This Affidavit is given to FPL Energy Producer Services, LLC to prove ownership for the purposes of laying, constructing, maintaining, operating, repairing, replacing, protecting, relocating, altering, removing or abandoning in place one or more pipeline(s). I hereby agree to indemnify and hold harmless FPL Energy Producer Services, LLC should any matter stated herein be proved false or misleading.

In 2012, Leonard conveyed the Ratliff Tract, which had been in a family trust, to the Adverse Claimants.

In 2015, the Couch Heirs obtained a survey of the Couch Tract and Disputed Property and, as a result, asserted ownership over the Disputed Property based on their record title. The Adverse Claimants sued Sheryl,[5] seeking title to the Disputed Property through adverse possession under either the ten or twenty-five year limitations periods in the Civil Practice and Remedies

---

[5]The record is unclear as to why they sued only Sheryl.

4

Code. Tex. Civ. Prac. & Rem. Code Ann. §§ 16.026, .027, .028 (West 2002). Roberts intervened in the suit. The Adverse Claimants then amended their petition to include both of the Couch Heirs as defendants. Both Couch Heirs eventually filed a joint amended pleading disputing the Adverse Claimants' trespass to try title claims and bringing counterclaims for trespass to try title, slander of title, collusion to defraud and deceive, and the filing of a fraudulent claim against real property. The Couch Heirs also sought a declaratory judgment that Leonard's 2009 adverse possession affidavit is defective and no evidence of adverse possession. The Couch Heirs named Leonard as a third-party defendant, bringing claims against him for collusion to defraud and deceive and for filing a fraudulent claim against real property.

The Adverse Claimants and Leonard filed a joint traditional motion for summary judgment. The Adverse Claimants sought summary judgment as a matter of law on their claims against the Couch Heirs and the Couch Heirs' claims third-party claims against them, and Leonard sought summary judgment on the Couch Heirs' claims against him. All three contended that the Couch Heirs' claims were barred by limitations. After considering the Adverse Claimants' and Leonard's summary-judgment evidence and the Couch Heirs' responsive evidence, the trial court granted all of the relief requested in the joint motion and rendered a final judgment on all claims.

The Couch Heirs bring two issues in this appeal: their first issue challenges the summary judgment on the Adverse Claimants' claims, and their second issue

5

challenges the summary judgment on their counterclaims against the Adverse Claimants and third-party claims against Leonard.

## II. Standard of Review

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). Likewise, a defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010), *cert. denied*, 562 U.S. 1180 (2011); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant-movant must present summary judgment evidence that conclusively establishes each element of the affirmative defense. *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008).

6

### III. Adverse Claimants' Trespass to Try Title Claims

In their first issue, the Couch Heirs contend the trial court erred by granting summary judgment on the Adverse Claimants' trespass to try title claim, in which they claim title by adverse possession.

### A.    Applicable Law

A plaintiff may prevail in a trespass to try title action by establishing title by limitations, i.e., adverse possession. Tex. Prop. Code Ann. § 22.001 (West 2014); *Martin v. Amerman*, 133 S.W.3d 262, 265 (Tex. 2004); *Ellis v. Buentello*, No. 01-12-00098-CV, 2012 WL 3528009, at *4 (Tex. App.—Houston [1st Dist.] Aug. 16, 2012, no pet.) (mem. op.). A claim for adverse possession requires six essential elements: (1) actual and visible appropriation and possession of the disputed property (2) that is open and notorious, (3) that is peaceable, (4) that is commenced under a claim of right, (5) that is adverse and hostile to the claim of the owner, and (6) that is consistent and continuous for the duration of the statutory period. Tex. Civ. Prac. & Rem. Code Ann. § 16.021(1) (West 2002), §§ 16.026–.027; *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990) (op. on reh'g); *Wells v. Johnson*, 443 S.W.3d 479, 489 (Tex. App.—Amarillo 2014, pet. denied).

A claimant asserting adverse possession under the ten-year limitations statute[6] must show, by a preponderance of the evidence, cultivation, use, or

---

[6]Although the Adverse Claimants pleaded application of both the ten and twenty-five year statutes, they argue primarily that adverse possession title vested in Leonard after ten years. Regardless, the twenty-five year statute

enjoyment of the property "in peaceable and adverse possession" for the entire ten-year period. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.026; *Mead v. RLMC, Inc.*, 225 S.W.3d 710, 715 (Tex. App.—Fort Worth 2007, pet. denied). Although title to land by adverse possession may be shown as a matter of law when the facts are conclusive, *see King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 757–58 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004), adverse possession is normally a fact question, *Bywaters v. Gannon*, 686 S.W.2d 593, 595 (Tex. 1985). Because adverse possession is a harsh doctrine, the law requires that a party's intention to appropriate property via adverse possession be "very clear." *Tran v. Macha*, 213 S.W.3d 913, 915 (Tex. 2006).

"[T]he mere grazing of land incidentally enclosed as a result of the construction of fences built for another purpose does not constitute possession that will ripen into title by limitation. The adverse claimant who relies upon grazing only as evidence of his adverse use and enjoyment must show as part of his case that the land in dispute was designedly enclosed." *McDonnold v. Weinacht*, 465 S.W.2d 136, 141–42 (Tex. 1971). A fence is not considered designedly enclosed if it existed before the adverse claimant took possession of the land and the claimant fails to demonstrate the purpose for which it was erected; in that case, the fence is considered a "casual fence." *Rhodes*, 802 S.W.2d at 646; *Orsborn v. Deep Rock Oil Corp.*, 267 S.W.2d 781, 786 (Tex.

requires the same proof during the applicable time period as the ten-year statute. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 16.026, 16.027.

1954). Evidence that a person has merely repaired or maintained a casual fence, even for the express purpose of keeping the person's animals within the enclosed area, generally does not change a casual fence into a designed enclosure. *Rhodes*, 802 S.W.2d at 646; *Mead*, 225 S.W.3d at 715. This is so because Texas has always treated unenclosed lands as commons for grazing livestock; therefore, the use of unenclosed lands for grazing livestock is allowed by law. *Mohnke v. Greenwood*, 915 S.W.2d 585, 593 (Tex. App.—Houston [14th Dist.] 1996, no writ). Courts have also found that cutting weeds, deer hunting, fishing, gardening, camping, clearing trees, and using the land for occasional storage do not necessarily establish a designed enclosure. *Id.* at 594; *see NJ Williams Family P'ship, Ltd. v. Winn*, No. 03-07-00724-CV, 2010 WL 142879, at *5–6 (Tex. App.—Austin Jan. 15, 2010, no pet.) (mem. op.); *Vaughan v. Anderson*, 495 S.W.2d 327, 331–32 (Tex. Civ. App.—Texarkana 1973, writ ref'd n.r.e.). *But cf. Reid Estates Civic Club v. Boyer, Inc.*, No. 01-09-00282-CV, 2011 WL 6938513, at *11 n.10 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.) ("[R]ecreational activities can be sufficient to establish hostile use with respect to land that both parties concede is only suitable for recreational pursuits.").

But because adverse possession is a fact-specific doctrine, exceptions apply. An adverse claimant may prove that he so changed the character of a casual fence that it has become a designed enclosure; thus, evidence of such a substantial modification can be sufficient to support a finding of adverse

possession. *Rhodes*, 802 S.W.2d at 646; *Mead*, 225 S.W.3d at 715. Additionally, proof of a designed enclosure is not necessary when the claimant proves sufficient nongrazing use of the disputed land "such that the true owner would have notice of the hostile claim." *Mead*, 225 S.W.3d at 715–16 (quoting *Perkins v. McGehee*, 133 S.W.3d 287, 292 (Tex. App.—Fort Worth 2004, no pet)).

## B.     Summary Judgment Evidence

The Adverse Claimants relied primarily on affidavit testimony to establish their claims. The Couch Heirs' responsive evidence raises a genuine issue of material fact as to the nature of Leonard's use and possession of the Disputed Property beginning in the late 1980s and early 1990s, but because the Adverse Claimants rely primarily on the ten-year statute, we will focus our review on the evidence pertaining to that time period.

### 1.     Adverse Claimants' Evidence

In his affidavit, Leonard averred that he is "thoroughly familiar" with the Disputed Property, which he contends was included with the 422.17 acres of land that he, Margie, and the Willbankses purchased in June 1962 from the Pettys and which he eventually sold to the Adverse Claimants.[7] According to Leonard, when he bought the Disputed Property and the Ratliff Tract together, a fence formed the western boundary of the Disputed Property, which is not separated

---

[7]The deed from the Pettys is included in the summary-judgment record. The Ratliffs do not dispute that the legal description of the Disputed Property is not included in the legal description in that deed.

10

from the Ratliff Tract by any fence. That fence runs along the eastern boundary of CR 4598, also known as Garvin Road and formerly known as CR 4690. There was a gate in the fence serving as the only entrance to both the Disputed Property and the Ratliff Tract. Leonard averred, "[T]he [Disputed Property] . . . has been under my fence since 1962." Leonard said that his family and the Willbanks family had maintained the fence from 1962 to January 5, 2017, the date of his affidavit. He also averred that "we"[8] claimed all of the land under the fence as had the Pettys.

According to Leonard, the Couch Tract is "immediately across CR 4598" from the Disputed Property and the Ratliff Tract; thus, "[a]ny activity on the [Disputed Property] could easily be seen from the road and [the Couch Heirs'] land." In 1971, the United States Department of Agricultural Soil Conservation Service (A.S.C.S.) built a livestock watering pond on the Disputed Property, which Leonard co-operated. Leonard averred that because the pond was very close to CR 4598, "[a]nyone in the area could see that [he], along with the A.S.C.S. were making valuable improvements to the land." Bulldozers, other equipment, and construction crews were present "for a number of weeks while the pond was being constructed," and no one objected or claimed the land was theirs. Leonard and his family have used the pond "exclusively . . . for watering livestock and recreation since 1972."

---

[8]This pronoun presumably refers to Leonard, Margie, and both of the Willbankses.

Leonard further averred that after the pond was built, he placed no trespassing signs on the fence because people were crossing the fence and fishing in the pond. Because travelers on CR 4598 would shoot at Leonard's signs, in 1972 or 1973, Robert put up a larger no trespassing sign that stated: "Private Property, NO Hunting and Fishing, TRESPASSERS WILL BE PROSECUTED." Attached to Leonard's affidavit is a photograph of that sign, which Leonard averred was, "[a]lthough somewhat rusted, . . . still on the fence running along the east side [of] CR 4598 and the west boundary of the" Disputed Property.[9] Leonard also attached a photograph of the pond.

The attached photographs of the fence along the west side of the Disputed Property show that it is a barbed wire fence with an elongated, metal swinging gate. The record does not indicate when any of the photographs were taken.

Leonard averred that since 1962, he and his family had "run cattle, sheep[,] and goats" on the Disputed Property. Since that time they had been "in peaceable possession" of the Disputed Property, which "has been open and obvious to everyone and adverse to any other claim of ownership." Neither he, his wife, nor the Adverse Claimants "knew any owners of the land" until the Couch Heirs claimed ownership in 2015.

The Adverse Claimants also provided an affidavit from Harry Lamance, a Wise County Commissioner for Precinct 3 since 2011. Lamance averred that he

---

[9]The sign appears aged and extremely weathered.

is "very familiar" with CR 4598, that his family had resided in that area for over sixty years, and that he had traveled that road "many times over the last sixty-five years." In addition, CR 4598 is in Lamance's precinct, and he is responsible for maintaining it. Lamance averred that

- the road has been in the same location for at least the last sixty-five years,

- the only changes to the road that he is aware of have been a resurfacing from gravel to a hard surface and replacement of an old bridge with a culvert,

- there has always been a good fence capable of turning cattle along the east side of the road,

- there is a gate in the east fence line which furnishes an entrance to the property, and

- "[t]he property enclosed by the fence was, and is occupied by the Ratliff family, Leonard Ratliff and Margie Ratliff, and currently Robert Ratliff and Linda Ratliff, for well over twenty-five years."[10]

Robert also provided an affidavit. In it, he averred that the fence along the western boundary of the Disputed Property was in that location when Leonard,

_____

[10]Because Lamance executed his affidavit in 2017, this evidence that the reputation in the community was that the Ratliffs owned the Disputed Property extends only to 1992. Thus, we will not consider this part of Lamance's affidavit in our analysis of whether the Ratliffs conclusively proved adverse possession under the ten-year or twenty-five year statutes.

13

Margie, and the Willbankses bought the Ratliff Tract in 1962. According to Robert,

> The entrance to the land was through a gate in the fence along the east right of way of CR 4598. That gate was the exclusive entry to the land from 1962 and before until 1982, when my wife and I purchased some land adjoining. The Mitchell Corporation built an oilfield road on the land me and my wife purchased. We used both the oilfield road and the gated entrance off CR 4598 to access the [Disputed Property]. We continued to access through the gate for a number of years after 1982. The gate is still in place and useable.
>
>       . . . In 1969 my father and I worked on the fence along the east right of way of CR 4598. We replaced a number of cedar post[s] with steel T-posts and put in steel pipe H-braces. The H-braces and many of the T-posts are still in place. The location of the fence was open, obvious and adverse to anyone claiming the [Disputed Property].

Robert also averred that the pond on the Disputed Property was stocked with fish and that he, Linda, and their family had fished and enjoyed the pond. He put no trespassing signs along the fence because "poachers" had been fishing the pond, and in 1972, he built and placed a large no trespassing sign "on the fence close to the pond." According to Robert, that sign was still in place when he signed his affidavit in January 2017.

Robert averred that he and his family had run cattle, sheep, and goats on the Disputed Property since he was in high school,[11] that they had "mowed and

---

[11]Nothing in the record indicates how old Robert was when he executed his affidavit; therefore, we cannot say, as do the Adverse Claimants, that his statements that certain events had occurred since he was in high school refer to 1962.

maintained" the Disputed Property, and that he had hunted and trapped on the Disputed Property. According to Robert,

> My family and I have continually held the [Disputed Property] in peaceable and adverse possession since 1962. We have occupied, used and enjoyed the [Disputed Property] since 1962. In 2015, some 53 years later, Defendant [Sharyl] Gross claimed an interest in the [Disputed Property]. Neither my wife, nor I ever knew any persons claiming the land until Defendant, [Sheryl] A. Gross claimed ownership in June, 2015. At no[] time from 1962 to the present did any of us ask for or receive permission to use the land. This was [the] first and only notice that someone other than my family claimed an interest in the land.

### 2. Couch Heirs' Evidence

The Couch Heirs attached responsive evidence tracing their inheritance of their undivided 1/2 interests in the Couch Tract—and record title to the Disputed Property—from Lucille to Derline to them. The Adverse Claimants do not dispute for summary judgment purposes that the Disputed Property is included in the legal description of the deed to Lucille and the deed to the Couch Heirs from Derline. The Couch Heirs also attached evidence showing that they paid the 2016 property taxes on the Disputed Property, had leased all of their 312 surface acres for grazing purposes beginning as early as 2012, and had also leased those acres for hunting since 2009.

In her summary judgment affidavit, Gross averred,

> . . . My entire life,[12] although I am not able to live there, the land has been continuously leased by us and our ancestors to

---

[12]Nothing in the record indicates Gross's age except that in her ex-husband's affidavit, he avers that they were married from October 12, 1981 to February 22, 2008 and had a son during their marriage. Thus, we can infer that

15

individuals who utilized the entire property, including the [Disputed Property], for grazing and hunting who were to be responsible for maintaining fences, but it was never a concern as to the Ratliff[]s since we shared a stock pond.

. . . Further, we have been paying taxes on approximately 312 acres (320 minus the land taken for Hwy 114) for approximat[e]l[]y 84 years, including 2016 just paid.

. . . During my great aunt Lucile's[13] lifetime, I believe Leonard Ratliff had already begun living on the adjoining property. The 2 families ran the properties as good neighbors and partners since each ran cattle. There was natural drainage going through a culvert under CR 4960 (Now CR 4598) onto our property on the east side of the [r]oad for several hundred feet flowing into a stock pond that straddled the property line with the Ratliff[]s – the pond is partially on both tracts.

. . . Everyone who lives in the area knew that the old dirt road, which [i]s shown in the Maps of Wise Co. published in 2012, was known as CR 4960 [and] was no longer a straight line because it had washed out due to a gully in the land on the NE side of the road. . . . Although I don't know what date it occurred, the original road ran more closely to the property line, but was rerouted causing the resultant portion of our property to be on the east side of the road. A partial fence line remains where the property line should be, as noted by Mr. Ballard upon his survey of the land, however, most . . . of the fence was removed, allowing Mr. Ratliff to encroach onto our property. This land was heavily wooded and cows did not typically enter the West or North side of the pond. . . .

. . . Because the land on the North side of our property is heavily wooded, the fence line along CR 4960 was very difficult to get to for maintenance. The heavy brush along with an old fenceline kept any live stock on the West side of CR 4960 from escaping onto the road. While Mr. Jake Holloway was leasing the land in the early

---

she was at least close to eighteen years old in 1981. *See* Tex. Fam. Code Ann. § 2.003 (West Supp. 2017).

[13]Although the Couch Heirs use the spelling "Lucile" in their affidavits, we use "Lucille" because that is the spelling used in the conveyance documents.

1990's, my ex-husband, Rick Lucier, and a good friend, Kevin Adams, went down to clear the fence line along CR 4960 where some of the fence needed repair or replacing. Since cows were not able to get out through the heavy brush, the fence repair was not a high priority on either side of CR[]4960. The improvements to the portion of land east of CR 4960 (including the [Disputed Property]) was not begun until the pipeline representatives came in to broker a deal for placement of a gas pipeline through our property and [the] Ratliff's in the summer and fall of 2008.

. . . .

. . . Our family built and maintained the fencing to make sure cows didn't get out on the road and protected our property rights. It was NOT built to accommodate the Ratliff[]s by fencing their cows in.

. . . .

. . . We were not absent owners with my son Nick living on the property for a time and me and my brother, with our relatives and friends, coming to use the property . . . for recreation, as well as constantly graze leased and leased for hunting. We have continuously used and occupied the property.

Roberts also provided an affidavit, in which he averred,

. . . . I grew up going to this Property [the 312 acres] and remember from even as a child[14] . . . that at one time the road went around the outer edge of our entire acreage[,] then the road in the northeast corner was at some point altered cutting off a portion of the our [sic] property. Still we kept not only the west side of now CR 4598 running north of Hwy 114 but also the east side of the road so the cows would not get on the road. I always knew we had a portion of property on that side of the road as well.

. . . As I recall there was fencing on the eastern boundary of your[15] property but due to the heavy trees one could not get to it including any cows or other farm animals, and the pond was always

---

[14]Once again, the record does not indicate Roberts's age.

[15]In context, it appears that this word was intended to be "our."

known to straddle our property and [the] Ratliff's, possibly built with possibly then my father or my great aunt Lucile discussing it.

. . . As I also recall, originally the road was gravel[,] then at some point more recently it was paved since it kept washing out. Some concrete was also put in some of the ditches to shore up the road.

. . . During the 1970s, as Ratliff points out, there was a pond dug which benefitted both adjoining property owners – the cows would share the pond. There was no need to restrict their movements since there were heavy woods on either side of the pond which actually still have fencing partially there in parts and the woods acted as a fence for the rest. I don't ever recall even seeing or meeting the Ratliff[]s until seeing them in Court when this lawsuit was begun.

. . . During the 1980's, Mr. Holloway began leasing the 'farm' (the property) for cattle grazing. He utilized ALL of the property including the portion now being claimed by the Ratliff[]s. And as a fence builder part of his lease was to maintain the fencing around the perimeter. In fact, Mr. Holloway was a friend of the Ratliff's and they both ran cattle together sharing the pond.

. . . Also at that time period, there was a culvert under the road which at some point got paved that could be used for running cows back and forth without crossing the road, which is possibly another reason we kept both sides fenced.

. . . Our family built the fencing on BOTH SIDES of now CR 4598 and maintained it. The eastern boundary was all grown up with trees creating a fence between the tracts which worked until more recently when the pipeline company cleared some of the acreage making way for their pipeline to go through.

. . . During this whole [unspecified] time there was NOT posted any NO Trespassing signage on the fences that I recall until sometime more recent after the pipeline went in.

. . . Going into the 1980's, my then brother in law, Rick Lucier, would go to the property as would I to enjoy camping out and using the property for recreation – hunting and fishing, etc. This included

18

staying at times on the [D]isputed [Property], during which no one approached us or asked us to leave.

. . . .

. . . At all times that I can recall, our property on the east side of CR 4598 has been fenced along the roadway by us AND was maintained by us (and those that did grazing of cattle on it[)]. . . .

. . . There was NO No Trespassing signs on the fencing that I saw until the one put on the new fencing now in place. I do not believe the Ratliff[]s have open[ly], notoriously or adversely occupied our property.

The Couch Heirs also provided an affidavit from Lucier, Sheryl's ex-husband, in which he averred

• that he was familiar with the Disputed Property,

• that he had gone with his son to the Couch Tract or met him there "many times,"

• that "[d]uring all times that [he] visited the property, including the [Disputed Property, he] witnessed no occupation by any people on the acreage nor cattle or other farm animals to graze on the acreage,"

• that during the 1980s, CR 4960 was a gravel road that had washed out and was rerouted and paved at some point, which required "the need for addressing the fencing on both sides of the road,"

19

• that around 1990-91, he, Holloway, and Kevin Adams took down, replaced, and repaired the fencing on both sides of Garvin Road and that the repairs were done for the Couch Heirs because it was "THEIR fence,"[16]

• the Couch Heirs' true east property line "had a thicket of trees and separated the properties of [the Couch Heirs] and Ratliff completely so any cows could not get through,"

• during "most of the 1980's and on into the 90's," he went with church groups on numerous campouts on the Disputed Property, "staying overnight or full weekends without interruption,'

• "[f]or all of this [unspecified] period, [he] installed "no trespassing["] signs on the fencing along the east side of Garvin Road, not the Ratliff[]s," and

• since the 1980s, he had visited the Couch Tract on occasion and had personally seen no evidence that Leonard or the Adverse Claimants were "exercising dominion and control over the [Disputed Property] in any fashion[,] and the east line was unaccessible [sic] for people or cattle to penetrate the acreage now claimed."

Finally, the Couch Heirs provided an affidavit from Harold Ballard, who performed a survey on their behalf in January and February 2015. Ballard averred that after research, he determined that the Adverse Claimants did not appear to be paying taxes on the property, nor did they have record title to it.

---

[16]The evidence shows that the Couch Heirs did not own the Couch Tract at this time.

Additionally, he "noted that the east fence line had been cleared out[,] but [he] found traces of it still existing,"[17] and he noted "several locations where the original fencing was found embedded in trees to verify where the true eastern property line was of the [Couch Heirs'] property."

## 2. Analysis

The Adverse Claimants rely primarily on the supreme court's opinion in *Butler v. Hanson*, 455 S.W.2d 942, 943–46 (Tex. 1970), and this court's opinion in *Perkins*, 133 S.W.3d at 291–93, for their contention that they conclusively proved the elements of adverse possession. But the facts in this case are distinguishable from the facts in those cases. Here, the Adverse Claimants did no more than show that a fact issue exists on all of the elements of adverse possession.

*Butler* involved title to ranch land in Glasscock County. 455 S.W.2d at 943. The evidence showed that beginning in at least 1932, the Hansons—who owned record title to land in Section 46—had continuously grazed livestock to a fence line, located in Section 3 immediately to the south of Section 46. *Id.* at 943–44. The original three-strand barbed wire fence had been in the same location since at least 1914, and in 1934, the Hansons placed a net fence around their entire ranch, including the fence located on Section 3 because it was "a better fence to

---

[17]In context, this sentence appears to refer to the traces of an old fence line that may have at one point separated the Disputed Property from the Ratliff Tract, not to the barbed wire fence along the eastern edge of CR 4598.

21

hold sheep." *Id.* at 944. Between 1949 and 1952, Hanson "rebuilt" the fences, put new fence posts in between the old posts, and continuously maintained them. *Id.* Hanson regarded the fence as his southernmost property line, as did Hanson's tenant from 1932 to 1952 and the Section 3 tenant from 1951 to 1963. *Id.* at 944–945. The general reputation in the community was that Hanson owned all of the land up to the fence, which was known as the Hanson Place. *Id.* at 945.

The supreme court held that this evidence was sufficient to support a jury verdict for Hanson and that the fence located on Section 3 was not a casual fence. *Id.* The court distinguished the facts from *Orsborn* because the Hanson tracts were contiguous and operated as a unit, the livestock were continuously grazed on the land in dispute, Hanson changed the character of the fence and essentially "made it his own," and tenants on both sides of the fence testified that the reputation in the community was that the fence belonged to Hanson and all of the land north of the fence belonged to him. *Id.* at 945–46.

In *Perkins*, this court held that the evidence supported the trial court's judgment that the McGehees' predecessor had obtained title to property under the ten-year limitations period. 133 S.W.3d at 291–94. The evidence showed that when the McGehees' predecessor bought the land in 1982, a fence was already located on adjacent land the Perkinses eventually bought. *Id.* at 292. But from 1982 to 1995, the ranch manager for the McGehees' predecessor had "worked on the fence several times a year," "repaired the water gaps in three gullies along the fence line[] as frequently as two or three times a year," and made these

22

repairs for the purpose of running cattle in the pastures that fronted the fence line. *Id.* He further "cleared an area of trees to the north of the fence line and planted and fertilized coastal Bermuda grass there for grazing." *Id.* Finally, he represented to the McGehees that the fence line was the southern boundary of the ranch they bought. *Id.*

This court concluded that the facts of *Perkins* were more akin to *Butler* than to *Orsborn* and, thus, that the existing fence was not a casual fence. *Id.* at 292–93. There was evidence of constant grazing of the entire land owned by the McGehees, which was fenced as a contiguous unit with the disputed property, the McGehees' predecessor modified the fence sufficiently to be considered his own, and the general reputation in the community was that the land was owned to the fence line. *Id.*

Here, there is no evidence as to the reputation in the community regarding the Disputed Property from 1962[18] to 1972 (Ten-year Period) or from 1962 to 1987 (Twenty-five-year Period); Lamance testified only as to the community reputation for twenty-five years before 2017, that is, from 1992 to 2017. And although there is evidence (1) that Leonard considered the fence on the east side of CR 4598 his fence, (2) that he and Robert replaced posts in the fence in 1969 and thereafter maintained it, and (3) that the Disputed Property and the Ratliff

---

[18]Limitations begins to run against a person with an adverse claim to land when the person adversely enters the land. *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 73 (Tex. 2011).

23

Tract had been grazed as a contiguous unit since 1962, there is no evidence regarding who originally built the fence along the east side of CR 4598[19] or that it was connected to and part of a larger fencing system around the Disputed Property and Ratliff Tract during either the Ten-year Period or Twenty-five-year Period.[20] *See Mixon v. Clark*, 518 S.W.2d 402, 406 (Tex. Civ. App.—Tyler 1974, writ ref'd n.r.e.) ("In determining whether the fence is or is not a casual fence, we must look to the whole fencing pattern and the use made of the fence, as well as all the other facts and circumstances."). That a gate in the fence was the only entrance to the Ratliff Tract from 1962 to 1982 is some evidence of an intent to enclose by a *prior* owner, and implies that the fence was part of a larger enclosure, but is not conclusive proof of a designed enclosure if Leonard and Lucille indeed shared use of the Disputed Property. And although Leonard

---

[19]Indeed, Leonard's own affidavit establishes that both the fence and the gate predate his purchase of the Pettys' property in 1962, which is as consistent with an inference that the fence was Lucille's as with an inference that it was the Pettys'.

[20]Evidence that a fence has always been used a certain way is not the same as evidence of the purpose for which the fence was built. *Mohnke*, 915 S.W.2d at 593. Leonard's maintenance of the fence unaccompanied by some other act evidencing an intention to enclose the Disputed Property along with his own—such as connecting other fencing around the Ratliff Tract to the fence—distinguishes this case from other cases similar to *Butler*. *See Heirs of Simmons v. Bouligny*, No. 13-09-00269-CV, 2010 WL 1619069, at *6–7 (Tex. App.—Corpus Christi Apr. 22, 2010, no pet.) (mem. op.); *Smith v. Fort Bend ISD*, No. A14-93-00289-CV, 1994 WL 26953, at *2 (Tex. App.—Houston [14th Dist.] Feb. 3, 1994, writ denied) (not designated for publication); *King v. Inwood N. Assocs.*, 563 S.W.2d 309, 313 (Tex. App.—Dallas 1978, no writ); *Doyle v. Ellis*, 549 S.W.2d 62, 63–64 (Tex. App.—Waco 1977, no writ); *Mixon v. Clark*, 518 S.W.2d 402, 406 (Tex. Civ. App.—Tyler 1974, writ ref'd n.r.e.).

averred that he co-operated the pond on the Disputed Property, he did not say with whom; he did not build the pond; and he did not state for whom the A.S.C.S. built the pond. Finally, there is no evidence about the frequency of the grazing on the Disputed Property during the Ten-year Period and Twenty-five-year Period.

Further, although the Couch Heirs' affidavits do not provide their respective ages, they at least raise a fact issue as to the reputation in their family about the ownership of the Disputed Property. Additionally, they show that at some point, a fence had separated the Disputed Property from the Ratliff Tract, possibly because CR 4598 was moved in that area, and that in the 1970s, cattle would share the stock pond, which straddled the Disputed Property and Ratliff Tract. Finally, the Couch Heirs raise a fact issue as to which family, or its tenants, maintained the fence along the eastern edge of CR 4598, or whether they both did.

Thus, we hold that the facts in this case are more like the facts in *Mead*, in which this court held that a genuine issue of material fact existed on the elements of adverse possession that precluded summary judgment. In *Mead*, the trial court had granted summary judgment for the record title holders, but this court determined that the following evidence raised a fact issue on the elements of adverse possession: (1) the purported adverse possessors had used the disputed tract "regularly and continuously" for grazing and ranching "at all times"; (2) the disputed tract was contiguous to and fenced within their land, which they operated as a unit with the disputed tract; (3) their tenant had repaired the fence

25

as needed over the years, adding and replacing posts, and adding, stretching, and tying wire; and (4) neither party provided evidence about the reputation in the community as to the true owner of the disputed tract. 225 S.W.3d at 719.

Arguably, the no trespassing signs distinguish this case from other adverse possession cases holding that similar evidence does not conclusively prove adverse possession. *See, e.g.*, *Rhodes*, 802 S.W.2d at 645–46; *Parker v. Weber*, No. 10-16-00446-CV, 2018 WL 2248369, at *3–4 (Tex. App.—Waco May 16, 2018, no pet. h.) (mem. op.); *Acrey v. Langston Land Partners, LP*, No. 11-14-00025-CV, 2016 WL 1725371, at *3–5 (Tex. App.—Eastland Apr. 29, 2016, no pet.) (mem. op.); *Mendoza v. Ramirez*, 336 S.W.3d 321, 328–29 (Tex. App.—El Paso 2010, pet. denied); *Anderson v. Shaw*, No. 03-08-00352-CV, 2010 WL 2428132, at *10–11 (Tex. App.—Austin June 18, 2010, no pet.) (mem. op.); *Hopkins v. State*, No. 03-07-00253-CV, 2009 WL 3806160, at *6–8 (Tex. App.—Austin Nov. 13, 2009, no pet.) (mem. op.); *Harlow v. Giles*, 132 S.W.3d 641, 647–50 (Tex. App.—Eastland 2004, pet. denied). But that evidence must be considered in light of the evidence that the families shared use of the stock pond in the 1970s and that the existing fence was built by the Couch Heirs' family to keep their own cattle off CR 4598. That Leonard placed no trespassing signs on the fence by the pond could be consistent with either his exclusive intent to keep Lucille and the Couch Heirs off the Disputed Property or an intent to keep all those other than permitted grazers and users off the property. *See Hopkins*, 2009 WL 3806160, at *8 (noting that purported adverse possessor's assertion to third

party that he owned disputed land was not sufficient evidence of hostile possession vis-a-vis record owner); *see also Rick v. Grubbs*, 214 S.W.2d 925, 927 (Tex. 1948) (citing authority for propositions that (1) to prove adverse possession, a claimant must show that he "wholly excluded" the true owner and (2) joint possession defeats an adverse possession claim). Accordingly, we conclude that evidence about the no trespassing signs does not tip the scales of the remaining evidence of adverse possession to conclusive proof. *But cf. Click v. Collins*, 273 S.W.2d 90, 91–93 (Tex. Civ. App.—Galveston 1954, writ ref'd n.r.e.) (holding evidence was sufficient to uphold jury verdict for adverse possessor when, upon taking possession of land adjacent to the disputed tract, he placed a fence around western side of his property, which connected with existing fences to enclose his property into a unit with the disputed tract and another adjacent property under one continuous fence; the enclosure was for the sole purpose of enclosing the land; he grazed his cattle "indiscriminately" and "continuously" within the enclosed area for twenty-six years; he initially repaired and thereafter continuously maintained all of the fencing around the enclosed area; and he posted no trespassing signs for twenty-six years—from 1925 until the time of trial).

Finally, there is conflicting evidence regarding who paid taxes on the Disputed Property from 1962 through 2015.[21] *See Phillips v. Willy*, No. 01-07-

---

[21]In the 2009 adverse possession affidavit, Leonard averred that he had paid the ad valorem taxes on the property "continuously" since 1962. Gross

00159-CV, 2010 WL 337001, at \*12 (Tex. App.—Houston [1st Dist.] Jan. 28, 2010, pet. denied) (mem. op.) (noting that although the payment of taxes on property is some evidence of adverse possession, it is not conclusive proof); *Hopkins*, 2009 WL 3806160, at \*8.

For these reasons, we hold that the trial court erred by granting summary judgment on the Adverse Claimants' claims against the Couch Heirs. We sustain the Couch Heirs' first issue.

## IV. Couch Heirs' Counterclaims and Third-Party Defendant Claims

Because the Adverse Claimants' and Leonard's summary judgment motion on the Couch Heirs' claims depends on the Adverse Claimants' successfully proving that title vested in them, and because we hold that the trial court erred by determining that the Adverse Claimants conclusively proved so, we further hold

---

averred in her summary judgment affidavit that "we," presumably her family, had been paying property taxes on the 312 acres for approximately 84 years. Not only are both of these assertions conclusory, but because they are directly opposing, they can do nothing more than raise a fact issue in this context. *Great Am. Reserve Ins. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965) ("Evidence which favors the movant's position is not considered unless it is uncontradicted."). It is well-settled that a trial court may not grant a motion for summary judgment if doing so requires it to determine the credibility of affiants or the weight of their testimony. *E.g.*, *Gaines v. Hamman*, 358 S.W.2d 557, 563 (Tex. 1962) ("It is not the purpose of the summary judgment rule to provide either a trial by deposition or a trial by affidavit, but rather to provide a method of summarily terminating a case when it clearly appears that only a question of law is involved . . . ."); *Gulbenkian v. Penn*, 252 S.W.2d 929, 932 (Tex. 1952); *cf. In re Zimmer, Inc.*, 451 S.W.3d 893, 901 (Tex. App.—Dallas 2014, orig. proceeding) ("A trial judge ruling on a motion for new trial based on affidavits of juror misconduct alone cannot perform the critical function of assessing the credibility of the affiants . . . .").

28

that the trial court erred by granting summary judgment on the Couch Heirs' counterclaims against the Adverse Claimants and third-party claims against Leonard. We thus sustain the Couch Heirs' second issue.

## V.    Conclusion

Having sustained both of the Couch Heirs' issues, we reverse the trial court's judgment, and we remand this case to the trial court.

/s/ Wade Birdwell
WADE BIRDWELL
JUSTICE

PANEL: WALKER, KERR, and BIRDWELL, JJ.

DELIVERED:  August 9, 2018

29