**Affirmed and Majority Memorandum Opinion and Concurring Memorandum Opinion filed July 6, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-21-00266-CV

---

**LARRY JOHNS, Appellant**

**V.**

**CARL R. GRANTOM AND LEIGH ANN GRANTOM, Appellee**

---

**On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Cause No. 2018-42908**

---

## MAJORITY MEMORANDUM OPINION

Plaintiff-Appellant Larry Johns appeals the trial court's take-nothing judgment dismissing his trespass to try title suit based on his claim of adverse possession. We affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The relevant adjacent properties, Lots 5 and 6, including the disputed tract in between them, sit on the eastern bank of Lake Houston in the Shorewood

subdivision, with street access and mailing addresses on West Shorewood Loop, Huffman, Harris County, Texas. Johns has been the record owner of Lot 5 since August 29, 2002, with his deed recorded September 19, 2002. Johns gained title through a warranty deed from either the estate of his grandmother or her heirs. According to appellant, prior to owning the property he had visited this property, once owned by his grandparents, as a child. Other than the chain-link fence surrounding the property, when he acquired the lot and up to the time of the litigation, the property remained unimproved, in the same condition as it was when he was a child.



Defendants' Ex. 2 (certain labels added)

Lot 5 is adjacent to and north of Lot 6. Defendants-Appellees Paul and Leigh Ann Grantom bought Lots 6 and 7 by deed dated March 27, 2013. Lots 6 and 7 together make up the Grantom's single contiguous residential property.

When the Grantoms first acquired the property it included a house, a well house, and a small storage building, a swimming pool, a dock, and a boat launch.



View of Lot 5 from West Shorewood Loop, facing west
Defendants' Ex. 5

Lots 6 and 7 contained several fences when the Grantoms first moved to the property in late 2013. Leigh Ann testified that the entirety of Lot 6 and Lot 7 was "encased" in chain-link fences at that time.

According to Leigh Ann, the fence on the north side of Lot 6—the one near Lot 5—was attached to the eastern-side, street-facing fence across the front of the Grantom lots. Mr. Grantom described it as "droopy" and "bent" with crushed chain links and looking as if it had never been maintained.

3

Shortly after purchasing the lot in 2013, the Grantoms erected a wooden privacy fence just inside, and generally parallel to the chain-link fence on the north side of Lot 6, extending from the front of the property (near the garage) roughly halfway across the northern section of the property.

Johns asserts that he owned that chain link fence on the North side of Lot 6. Though he did not know who constructed the fence, Johns testified that it was in place when he first obtained Lot 5, and that it was constructed of the same material as the fences surrounding his property. He testified it had always been there, since he was 7 or 8 years old (in the 1970s), and that he believed that the purpose of the fence was to keep livestock out or keep children off the property; he also testified that it was a boundary indicator.

When the Grantoms bought their land in 2013, the seller provided them a survey of the property; they did not obtain one themselves. The survey showed no encroachment on the property.

Planning to make some renovations, in 2017, the Grantoms obtained a land survey (Defendents Ex. 2 shown above) that showed the chain-link fence between lots 5 and 6 running east to west beginning at the northeast corner of Grantoms' Lot 6 and extending to the shore of Lake Houston, 260 feet away. While the survey shows the chain-link fence beginning almost exactly on the property line at the east end next to the road, the property line and fence line diverge, ultimately creating a seven-to-eight-foot gap at the shoreside end of the property—separating about 1,029 square feet of land between the fence and the property line from the rest of Lot 6. This portion of land within Lot 6, including and north of the previously existing chain-link fence and south of Lot 5, is the land disputed in this lawsuit.[1]

---

[1] Johns subsequently obtained his own land survey. The result was consistent with the Grantoms' 2017 survey.

4

Just to make certain, the Grantoms commissioned a second survey in 2018 which also showed that the true property line was north of the chain link fence (although the 2018 survey showed that a substantial portion of the chain link fence was missing.).



**Events prompting the lawsuit**

The events precipitating the lawsuit occurred in 2018, when the Grantoms, acting on the land survey, began to remove the chain-link fence. Johns promptly intervened. He verbally confronted either the Grantoms or their fence building contractor, claiming he owned the property and his conduct ultimately prompted Mrs. Grantom to call the police. Johns also sent a cease and desist letter. (Though the letter failed to provide Johns contact information, Mrs. Grantom acknowledged

receiving a version of the letter left in their mailbox).   By June 2018, Johns filed his trespass to try title suit, based on his claim of adverse possession. In response to Johns' lawsuit, the Grantoms filed a counterclaim seeking a declaratory judgment defining the parties' property rights.   The case went to trial, the court heard testimony only from the litigants, Johns, and Paul and Leigh Ann Grantom.

## Evidence of use of the disputed property

In July 2017, the bulkhead that protected the edge of the Grantoms' property from erosion into Lake Houston was crumbling at the northwest corner of Lot 6 in the disputed zone. The waves from the lake and the roots of a nearby oak tree threatened to erode the boat launch on Lot 6. The Grantoms took down the western-most portion of the chain-link fence and replaced the bulkhead all the way to the platted property line. They then replaced that portion of the fence where it had stood before taking it down for repairing the bulkhead.

Johns was asked some questions about his use of this disputed zone, near the Grantoms' boat launch, and he explained as follows:

> Q. All right. And did you ever repair that condition, repair the washing?
>
> A. We constantly put -- I'm sorry, sir, what?
>
> Q. I said did you do any --
>
> A. I'm sorry.
>
> Q. Did you do anything to repair the washout?
>
> A. Which time, sir?
>
> Q. Did you ever repair the washout?
>
> A. We patched that a number of times, sir.
>
> Q. So you did repair it?
>
> A. Yes, sir, we back-filled the hole a number of times through the years.

Q. When was the last time you did?

A. Sir, I couldn't even tell you the last time.

The Grantoms explained that in 2017, a month after doing the repairs around the bulkhead, a tree fell from the north side onto the fence, damaging a portion of the fence. The Grantoms pushed the tree off the fence but did not repair the fence. They testified that Johns did not repair the fence either. Johns denied that a tree from his yard ever fell on the fence.

At the close of trial, the trial court took the case under advisement, and then issued a take nothing judgment against Johns on March 9, 2021. At appellant's request, we abated the appeal so that the trial court could issue findings of fact and conclusions of law. These findings include the following:

> 3. . . .Defendant's Exhibit 5. . .shows that at the street side, the said chain link fence is not connected to the chain link fence running across the front of the Johns' lot; defendants testified that it was connected to the chain link fence running across the front of the Grantoms Property, which lead [sic] them to believe it was their fence after the February 2017 survey.
>
> 5. The said chain link fence was severely dilapidated and in need of complete replacement.. . .Defendants' Exhibit 3 [Feb. 16, 2018 Survey] also shows a large portion of the said chain link fence missing, caused by a fallen tree on Johns' Lot. After Johns' tree fell and knocked down said large portion of the said chain link fence, Johns did nothing to replace the missing portion.
>
> 6. The said chain link fence was not a visible appropriation and possession of the Disputed Property. Further it existed before Johns acquired Johns' Lot, and before Johns took possession of the Disputed Property; and is no evidence or legally insufficient evidence showing that the said chain link fence "designedly enclosed" the Disputed property.
>
> 8. As far back as property tax records exist, Johns and his predecessor owners of Johns' Lot (being only Lot 5) never paid taxes on the disputed property, which was included with the tax account for Lot 6 of the Grantoms' property, the taxes for which the Grantoms have

7

paid since they acquired the Grantoms' Property in 2013.

9. Johns lot has been and remains vacant; Johns does not frequent Johns' Lot or regularly mow or tend to it.

11. There is no evidence or legally insufficient evidence that Plaintiff or the predecessor owners of Plaintiff's Lot occupied or use [sic] the Disputed Property.

12. There is no evidence or legally insufficient evidence that Plaintiff or the predecessor owners of Plaintiff's Lot ever used, cultivated or enjoyed the Disputed Property.

13. There is no evidence or legally insufficient evidence as to the purpose of construction of the Fence.

Conclusion 2: The Fence cannot support a claim of adverse possession.

Conclusion 3: The fence was not a visible appropriation; it was a slight encroachment; and did not give defendants sufficient notice of an adverse claim.

## II. ISSUES AND ANALYSIS

Johns challenges the trial court's judgment, rejecting his claim of ownership of the disputed property based on his adverse possession claim, for legal and factual insufficiency.

### Standard of Review and Legal Standards

We review the trial court's decision for legal sufficiency of the evidence by the same standards applied in reviewing the evidence supporting a jury's finding. *Wood v. Kennedy*, 473 S.W.3d 329, 334 (Tex. App.—Houston [14th Dist.] 2014, no pet.). A party attacking legal sufficiency relative to an adverse finding on which it had the burden of proof must show that the evidence establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). We review the entire record to determine whether the contrary proposition is established as a matter of law only if there is no evidence to support

8

the judgment. *See id.* Anything more than a scintilla of evidence is legally sufficient to support the judgment. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). The final test for legal sufficiency is whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

When reviewing the factual sufficiency of the evidence, we examine the entire record, considering all the evidence both in favor of and contrary to the finding. *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). When a party attacks the factual sufficiency of an adverse finding on an issue on which it had the burden of proof, the party must show on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).

In conducting a legal and factual sufficiency review, we remain mindful that the trial court, as fact finder, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *O.C.T.G., L.L.P.*, 525 S.W.3d at 831. The trial court's findings of fact have the same force and dignity as a jury verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). We review the trial court's findings using the same standards of review applicable to a jury verdict. *See MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). Unchallenged findings of fact are binding on this court "unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986). In an appeal from a nonjury trial, a sufficiency challenge must be directed at a specific finding, rather than the judgment as a whole. *Levy v. Leach*, No. 14-19-00843-CV, 2021 WL 4165199, at *4 (Tex.

App.—Houston [14th Dist.] Sept. 14, 2021, no pet.); *see Zagorski v. Zagorski*, 116 S.W.3d 309, 319 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

To prevail on the ten-year limitations period in section 16.026 of the Civil Practice and Remedies Code, a person claiming adverse possession of property must prove that the person actually and visibly possessed the disputed property, and the possession: (a) was adverse and hostile to the claim of the record title owner; (b) was open and notorious; (c) was peaceable; (d) was exclusive; and (e) involved continuous cultivation, use, or enjoyment for ten years. *Kazmir v. Benevides*, 288 S.W.3d 557, 561 (Tex. App. – Houston [14th Dist.] 2009, no pet.); *see also Gutierrez v. Lorenz*, No. 14-18-00608-CV, 2020 WL 1951606, at *3 (Tex. App.—Houston [14th Dist.] Apr. 23, 2020, no pet.) (mem. op.). "Visible appropriation" is required; mistaken beliefs about ownership do not transfer title until someone acts on them. *Tran v. Macha*, 213 S.W.3d 913, 914 (Tex. 2006) (per curiam); *Bywaters v. Gannon*, 686 S.W.2d 593, 595 (Tex. 1985); *see also Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 198 (Tex. 2003) (holding that "a record titleholder's ignorance of what it owns does not affect the running of limitations"). ).

The claimant must submit undisputed and conclusive evidence of probative force on each essential element of adverse possession, and inferences are never indulged in his favor. *Bywaters*, 686 S.W.2d at 595. Peaceable possession means possession of real property that is continuous and is not interrupted by an adverse suit to recover the property. Tex. Civ. Prac. & Rem. Code § 16.021(3). The "possession must be of such character as to indicate unmistakably an assertion of a claim of exclusive ownership in the occupant." *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990). However, the character of use required to establish adverse possession varies with the nature of the land and its adaptability to particular uses.

*Kazmir*, 288 S.W.3d at 561. An adverse possession claimant need only use the land for some purpose to which it is adaptable, in the same manner an ordinary owner would use the property. *Id.*

## Analysis

Johns specifically attacks the trial court's finding that the fence (1) "was a 'casual fence'" and (2) "was not a visible appropriation; it was a slight encroachment; and did not give Defendants sufficient notice of an adverse claim."

Although Johns challenges no other specific findings by the trial court, reading all sections of his brief together, we liberally construe his argument to be that the evidence conclusively establishes *all* vital facts in support of his adverse possession claim, including facts vital to the last element—Johns' possession of the disputed property involved continuous cultivation, use, or enjoyment for ten years. *See Castillo v. Luna*, 640 S.W.3d 256, 264 (Tex. App.—Houston [14th Dist.] 2021, pet. filed)(explaining evidence of existence of fence that demarcates adverse claim, while supportive of other elements of adverse possession, was not evidence of continuous "cultivation, use, or enjoyment" of *disputed* property for 10 years); *see also, e.g., Pool v. Ford Motor Co.*, 715 S.W.2d 629, 633 (Tex. 1986) ("It is our practice to liberally construe the points of error in order to obtain a just, fair and equitable adjudication of the rights of the litigants. We look not only at the wording of the points of error, but to the argument under each point to determine as best we can the intent of the party.").

**The existence of the chain-link fence, whether casual or designedly enclosed, does not provide evidence of continuous cultivation, use, and enjoyment of disputed property for ten years.**

In Texas the law of adverse possession has historically recognized two kinds of fences: "casual fences" and fences that "designedly enclose" an area. *Castillo v. Luna*, 640 S.W.3d at 262–63. The law developed in the backdrop of property

owners with livestock where unenclosed land is regarded as commons for grazing livestock. *Id*. at 263. Thus, the use of unenclosed land for grazing livestock does not, of itself, constitute adverse possession. *McDonnold v. Weinacht*, 465 S.W.2d 136, 141 (Tex. 1971). On the other hand, land shown to be enclosed by a fence that was erected for the purpose of enclosing the area, e.g., to secure livestock, is considered designedly enclosed, and could support establishing the elements of notice and intent in achieving title by adverse possession. The Supreme Court explained:

> If the fence existed before the claimant took possession of the land and the claimant fails to demonstrate the purpose for which it was erected, then the fence is a "casual fence." *Orsborn v. Deep Rock Oil Corp.,* 153 Tex. at 288–89, 267 S.W.2d at 786. Repairing or maintaining a casual fence, even for the express purpose of keeping the claimant's animals within the enclosed area, generally does not change a casual fence into a designed enclosure. *McDonnold v. Weinacht,* 465 S.W.2d at 142–43. A claimant may so change the character of a casual fence that it becomes a designed enclosure, and evidence of such a substantial modification is sufficient to support a jury finding of adverse possession. *Butler v. Hanson,* 432 S.W.2d 559 (Tex. Civ. App.—El Paso), *aff'd,* 455 S.W.2d 942 (Tex.1970). However, we have neither been cited to nor found a case that establishes whether or when modification requires a finding of adverse possession as a matter of law.

*Rhodes v. Cahill*, 802 S.W.2d 643, 646 (Tex. 1990).

Over the past several decades, some courts have questioned whether the distinction between a casual fence and a designedly enclosing fence applies to boundary disputes in established residential neighborhoods. Not long ago our sister court weighed in on the question, and construing language from the 2006 Supreme Court's decision in *Tran*, reasoned that the distinction was "unnecessary in residential neighborhood disputes." *KB Tex. Investments, LLC v. Spiller*, No. 01-16-00068-CV, 2017 WL 372164, at *8 (Tex. App.—Houston [1st Dist.] Jan.

12

26, 2017, no pet.). Over the intervening years, our court has at least twice considered and declined to accept or reject the reasoning in *Spiller*, by finding application of the historical distinction immaterial to the outcome. *Castillo v. Luna*, 640 S.W.3d 256, 264 (Tex. App.—Houston [14th Dist.] 2021, pet. filed); *Levy v. Leach*, No. 14-19-00843-CV, 2021 WL 4165199, at *8 (Tex. App.—Houston [14th Dist.] Sept. 14, 2021, no pet.). Today, we continue along that path.

If the historical distinction in *Rhodes* is necessary, then the trial court did not err in finding that the chain-link fence is a "casual fence" because Johns failed to establish the purpose of the preexisting chain link fence. *Rhodes v. Cahill*, 802 S.W.2d 643, 646 (Tex. 1990) (sub. op. on denial of reh'g) ("If the fence existed before the claimant took possession of the land and the claimant fails to demonstrate the purpose for which it was erected, then the fence is a 'casual fence.'") citing *Orsborn v. Deep Rock Oil Corp.*, 153 Tex. 281, 288–89, 267 S.W.2d 781, 786 (1954).

There is no evidence that Johns "designedly enclosed" the disputed area. Johns admitted neither erecting nor maintaining the fence; he provided only his speculation as to his belief as to the purpose the fence. It is unclear who erected the fence, or why they built it, and accepting the Grantoms' testimony, Johns does not show the chain link fence was ever *his* fence; it was just as likely (if not more likely) that a prior owner of the Grantoms' Lot 6 built the fence, considering that it was attached to the fencing running across the east side of the Grantoms' Lots 6 and 7. There is insufficient evidence that Johns or his predecessors ever altered, repaired, or maintained the fence. On this record, if the historical distinction is necessary, the trial court properly determined the fence to be a casual fence.

If the historical distinction is, as Johns contends, unnecessary, then the fence's existence still does not affect our reasoning, as it does not supply evidence

13

of use, cultivation, and enjoyment. According to *Spiller*, we need not look at the enclosed status of the property and instead are forced to "ask[] about the origin and use of an improvement, to answer the same question of notice and intent." *See Castillo*, 640 S.W.3d at 264. For the reasons this court explained in *Castillo*, the fence itself was not evidence on the separate, last adverse possession element of the disputed land's use. *See id.* (explaining that claimant must show cultivation, use, or enjoyment of that strip of land, not merely use of the improvement or the adjoining land as a whole). Similarly, evidence of Johns' use, cultivation, and enjoyment of Lot 5 is not evidence of use, cultivation, and enjoyment of the disputed property. *See id*; *see also Tran,* 213 S.W.3d at 915 (considering actual use of driveway strip).[2]

The record lacks any proof of Johns' use or enjoyment of the *disputed* property and lacks sufficient proof of Johns' cultivation of the disputed property. At best, some testimony was elicited that Johns "repair[ed] the washout" on the shoreside near the boat launch, a place which arguably would have been on disputed property. Johns however failed to provide any detail about when, how often, and what contributed to "repairing the washout".

Johns failed to show that the evidence conclusively establishes each element of his claim for adverse possession over the disputed property. Viewing the evidence in the light most favorable to the trial court's finding, we conclude that

[2] Affording Johns the benefit of evidence of use of Lot 5 as also evidence of his use of the disputed property would only provide evidence *relevant* to the consideration of the last element, *not overwhelming or even supportive evidence* on the element. That is, in light of Johns' use of his own property (Lot 5), which Mrs. Grantom described as appearing "abandoned", the infrequency of Johns visits to the property, lack of improvements, cultivation or maintenance, having been "red-tagged" for not mowing the lawn, and non-payment of taxes, we cannot conclude the trial court's judgment reversible for factual or legal insufficiency. *See Phillips v. Willy*, No. 01-07-00159-CV, 2010 WL 337001, at *9 (Tex. App.—Houston [1st Dist.] Jan. 28, 2010, pet. denied)(weekend visits to property and occasional family reunion did not constitute appropriation of the property).

reasonable and fair-minded people could not have found that Johns intended to claim the disputed land and exclude others or that he continuously used, cultivated, or enjoyed the disputed property for the requisite period. *See City of Keller*, 168 S.W.3d at 827. And viewing the evidence in a neutral light, the court's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Maritime Overseas Corp.*, 971 S.W.2d at 407. Thus, we conclude both legally and factually sufficient evidence supports the trial court's judgment.

We therefore overrule Johns' sole issue.

### III. CONCLUSION

Having overrule appellant's sole issue, we affirm the trial court's judgment.

/s/     Randy Wilson
                Justice

Panel consists of Justice Spain, Justice Poissant and Justice Wilson. (Spain, J., concurring).

15